**JOHNSON & HIGGINS OF TEXAS, INC., Petitioner,**

v.

**KENNECO ENERGY, INC., f/k/a Armada Supply Inc., Respondent.**

No. 96–0244.

Supreme Court of Texas.

Argued Oct. 22, 1996.

Decided Jan. 16, 1998.

Dissenting Opinion Dec. 7, 1997.

Joe R. Greenhill, Bob E. Shannon, Austin, Stephen G. Tipps, Jane A. Bland, Robert Harrison Pemberton, Amy Eikel, Houston, for Petitioner.

John L. Russell, David J. Mullican, Jr., Robert Eikel, George E. Pletcher, Kimberly Ann Warren Brown, Nina Cortell, Houston, for Respondent.

ABBOTT, Justice delivered the opinion of the Court, in which PHILLIPS, Chief Justice, ENOCH, BAKER and HANKINSON, Justices, join. SPECTOR, Justice, joined Parts I, II, III, and IV of the Court's opinion.

We withdraw our opinion of December 11, 1997, and substitute the following in its place. The parties' motions for rehearing are overruled.

This insurance case involves statute of limitations and collateral estoppel issues, and reevaluates the common-law method of calculating prejudgment interest under *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex.1985). The court of appeals reversed the trial court's judgment in favor of Johnson & Higgins, and rendered judgment for Kenneco Energy. We modify the court of appeals' judgment and remand the cause to the trial court to render judgment in accordance with this opinion.

## I. BACKGROUND

In 1982, Kenneco Energy, an oil trading company then known as Armada Supply, purchased a tanker cargo of fuel oil from Petrobas, a Brazilian oil company, to be shipped from Rio de Janeiro to New York. Under their contract, the purchase price of the oil was to be measured by the market price on the day the tanker arrived in New York. The contract was on a "C.I.F." basis, meaning that Petrobas bore the cost of shipment, insurance, and freight.

Petrobas purchased insurance for the cargo from Banorte, a Brazilian underwriter, for the amount of the purchase price, plus ten percent. This amount was the "primary coverage." In addition to the insurance provided by Petrobas, Kenneco already had its own insurance from a group of London underwriters, which it obtained through an insurance broker, Johnson & Higgins of Texas, Inc. (J & H).

The oil tanker sailed November 16, 1982. While the tanker was en route, Kenneco contracted to sell the oil, upon delivery in New York Harbor, to Sun Oil Trading Company (Sun) for $30.55 per barrel. This contract was on a "delivered" basis (rather than a C.I.F. basis), meaning that Kenneco retained title to the oil and assumed the risk of loss until Sun accepted the cargo in New York. Kenneco's profit on the oil was to be the difference between the sale price of $30.55 per barrel and the purchase price to be determined by the market price upon delivery.

After the tanker set sail, the market price of the oil began to decline. Because Kenneco's purchase price was determined by the market price, as the market price decreased, Kenneco's potential profit on the sale increased. At the same time, the primary coverage amount under the Brazilian insurance policy, which was tied to the market price Kenneco would pay to Petrobas (plus ten percent), declined. Concerned about the adequacy of insurance coverage for its increasing potential profit, anticipated to be $1.5 million, Kenneco arranged a meeting with J & H to discuss coverage under the London policy. On November 30, 1982, while

the tanker of fuel sailed to New York, Kenneco sent Carolyn Brown to meet with Jim Anderson of J & H to discuss coverage.

According to Kenneco, Brown met with J & H to address two primary concerns. First, Kenneco was worried that it would be unable to collect on a claim under the Banorte policy because Kenneco had heard that the Brazilian insurers had a dubious reputation. To avoid that potential problem, Kenneco wanted to claim the primary coverage amount directly from the London underwriters. In essence, Kenneco wanted assurance from the London underwriters that it would be able to recover the amount insured by Banorte.

In response, Anderson prepared a certificate of insurance under the contingency coverage Kenneco already had with the London underwriters. Anderson did not, however, offer the possibility of a "guarantee of collectibility," which would insure Kenneco against the risk that Banorte would not pay. This later proved problematic because the policy's cover sheet stated that contingency coverage required a back-to-back C.I.F. sale, meaning that both the sale from Petrobas to Kenneco and the sale from Kenneco to Sun needed to be C.I.F.

Anderson testified that he believed the sale was back-to-back C.I.F. In a back-to-back C.I.F. sale, Kenneco would not hold title to the cargo during the voyage; instead, Kenneco's buyer would take title and accordingly bear the risk of loss of the cargo during transport. In a back-to-back C.I.F. sale, Kenneco would prepare a certificate of insurance under its contingency coverage and deliver it to the purchaser of the cargo, who would then replace Kenneco as the party asserting a claim.

As it turned out, the sale from Kenneco to Sun was contracted on a delivered basis, not C.I.F.; therefore, Kenneco retained both the title and the risk. As a consequence, the contingency coverage procured by J & H did not protect Kenneco against the possibility that the Brazilian underwriters would not fulfill their insurance obligations.

The second concern Brown expressed to J & H was that the primary coverage through Banorte was insufficient to cover its profits on the deal because Banorte insured only the purchase price (i.e., the market price) plus ten percent. Kenneco wanted to insure against the loss of the sizable profit it would make on the Sun contract. Anderson responded by preparing a certificate under Kenneco's preexisting increased value coverage, increasing the insured value of the cargo from the market price plus ten percent (the primary coverage amount) to the contract amount of $30.55 per barrel (thereby including the profit).

In preparing both certificates, Anderson apparently did not realize that Kenneco could not recover under both the increased value provision, under which Kenneco retained title and bore the risk of loss, and the contingency coverage provision, under which Kenneco's buyer held the title and the risk. Nevertheless, Brown discerned from her meeting with Anderson that Kenneco was protected by "contingency coverage" in the event the Brazilian underwriters failed to pay, and that the profits on the Sun contract were covered by the increased value provision. Kenneco paid premiums for both the contingency coverage and the increased value coverage.

When the tanker arrived in New York Harbor, Sun rejected the cargo and canceled the contract because the oil arrived both short and contaminated. Before leaving Brazil, the cargo was apparently deficient by 8,000 barrels. In addition, the tanker crew used some of the cargo as fuel during the voyage, pumping in seawater to replace the depleted amount.

Sun rescinded the contract. Had it not, Kenneco's profits would have been about $1,690,780.00. Kenneco was able to partially renegotiate the contract with Sun; however, the renegotiated contract was also lost when the tanker fled the harbor to avoid being sanctioned for its conduct. Eventually, Kenneco convinced the tanker captain to return, took control of the cargo, and began to recondition the oil. As the reconditioned oil became saleable, Kenneco sold it in several parcels at various prices below the $30.55 per barrel contract price.

Kenneco asserted insurance claims under both the Brazilian and London policies,

claiming the full amount of its lost profit under the canceled Sun contract. The London underwriters refused Kenneco's contingency coverage because the sale was not back-to-back C.I.F. as required under the insurance policy. The London underwriters did recognize coverage under the increased value provision; however, their position was that the increased value coverage insured only against physical loss or damage to the cargo up to the amount insured, not the loss of profits due to cancellation of a contract, as Kenneco urged. The London underwriters took a formal position on the claim in March 1983, denying contingency coverage and rejecting Kenneco's interpretation of the increased value provision.

Kenneco filed suit against Banorte and the London underwriters in April 1983 in New York federal district court. *Armada Supply, Inc. v. Wright,* 665 F.Supp. 1047 (S.D.N.Y. 1987), *aff'd in part, rev'd in part,* 858 F.2d 842 (2d Cir.1988). With the contingency coverage in dispute, Kenneco could not look solely to the London underwriters for coverage, but had to bring suit against Banorte, which disputed Kenneco's primary coverage. Kenneco did not name J & H as a defendant, but did offer evidence about the events at the November 30, 1982 meeting between Brown and Anderson, and Kenneco's contention that Anderson's and J & H's representations resulted in lost profits coverage.

After a non-jury trial, the federal district court held that the contingency coverage was inapplicable because the sale was not back-to-back C.I.F. The court also concluded that the increased value provision covered physical loss and damage, but not the loss of the Sun contract. In determining the scope of the lost profits and lost contract coverage, the court considered J & H's conduct during and after the November 30 meeting to decide what agreements had been made regarding coverage. On appeal, the Second Circuit affirmed most of the district court's judgment, but reversed in part on the issue of sue and

labor expenses.[1] *Armada Supply, Inc. v. Wright,* 858 F.2d 842, 851 (2d Cir.1988). The Second Circuit rendered its decision on September 22, 1988.

While the federal action was pending in New York, Kenneco indicated that it might file a separate suit against J & H for mishandling its insurance needs. J & H and Kenneco signed a standstill agreement on December 15, 1986, delaying any such action pending the outcome of the federal litigation. The standstill agreement contained a provision tolling the statute of limitations for "the period between December 15, 1986 and the date when thirty days ... elapsed following the final determination of the New York Action."

In June 1988, prior to the Second Circuit's decision, J & H filed a declaratory judgment action in Texas state court, seeking a ruling that res judicata and collateral estoppel barred Kenneco from filing suit against it. Kenneco counterclaimed and sought damages on a variety of claims. A jury found that Kenneco suffered damages in the amounts of: $1,500,000 for fraud; $1,500,000 for Insurance Code[2] violations; $1,560,000 for breach of the contract to secure lost profits coverage; $412,273.66 for breach of the contract to secure contingency coverage; and $1,700,000 for negligence. The jury also found that Kenneco discovered or should have discovered the basis for its Insurance Code claim by March 1983.

J & H moved for judgment based on the ground that the Insurance Code and negligence claims were barred by their respective statutes of limitations. J & H alternatively moved for judgment notwithstanding the verdict on the grounds that: (1) all of Kenneco's claims were barred by collateral estoppel and res judicata, and (2) no evidence supported the jury's findings of breach of contract and fraud. The trial court granted J & H's motion without stating the grounds.

1. Sue and labor expenses are the reasonable expenses incurred by an insured to mitigate its loss and thus reduce the amount to be paid by the underwriter. *Armada Supply,* 858 F.2d at 853.

2. The parties disagree as to whether the claim submitted to the jury is properly characterized as an Insurance Code claim or a DTPA claim. Because we conclude that the claim submitted can be characterized as an Insurance Code claim, *infra* at 517, we will refer to it as such.

The court of appeals reversed the trial court's judgment, finding that: (1) res judicata and collateral estoppel did not bar any of Kenneco's claims; (2) Kenneco's Insurance Code claim was not barred by limitations; and (3) although Kenneco's negligence claim accrued in March 1983 and would otherwise be barred by limitations, equitable estoppel prevented J & H from asserting a limitations defense. 921 S.W.2d 254, 261–63. Accordingly, the court of appeals rendered judgment in favor of Kenneco, awarding $1,972,-273.66 in damages (based on the breach of contract claims[3]), $275,000 in attorney's fees, and $2,750,952.39 in prejudgment interest. To calculate the prejudgment interest, the court of appeals held that the case was controlled by *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex.1985), and not by Tex.Rev.Civ. Stat. article 5069–1.05, section 6. As a result, the court of appeals compounded the prejudgment interest on a daily basis beginning six months from the date Sun rejected the cargo. 921 S.W.2d at 267.

We granted this application for writ of error to determine: (1) whether limitations bars the negligence and Insurance Code claims; (2) the appropriate preclusive effect of the federal court judgment on the state court action under the doctrine of collateral estoppel; and (3) the proper method for calculating prejudgment interest on claims governed by *Cavnar*.

## II. LIMITATIONS

J & H asserts that limitations bars Kenneco's negligence and Insurance Code claims. We agree.

### A. Negligence

The court of appeals held that Kenneco's negligence claim against J & H accrued in March 1983, when the London underwriters denied coverage of Kenneco's claim. 921 S.W.2d at 262. However, it found that equitable estoppel barred J & H's limitations defense based upon the jury's finding that Kenneco's delay in filing suit was caused by J

& H's conduct. *Id.* at 265–66. In its application for writ of error, J & H asserts that the court of appeals correctly held that Kenneco's negligence claim accrued in March 1983, but erred in holding that equitable estoppel prevents J & H from asserting its limitations defense. Kenneco responds that the court of appeals correctly found and applied equitable estoppel, or, in the alternative, the court of appeals erred in determining the date of accrual because Kenneco's negligence claim did not arise until August 1988, the date when the Second Circuit affirmed the district court's holding of no coverage and when Kenneco first suffered injury. We agree with J & H that the negligence cause of action accrued in March 1983, and that equitable estoppel does not bar J & H's assertion of its limitations defense.

A cause of action generally accrues, and the statute of limitations begins to run, when facts come into existence that authorize a claimant to seek a judicial remedy. *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex.1990); *see also Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 351 (Tex. 1990) ("[A] cause of action can generally be said to accrue when the wrongful act effects an injury."). Today we are asked to decide whether, in a suit by an insured against its agent for negligent breach of the agent's duty to obtain insurance, the injury-producing event was the denial of coverage by the insurance company, or the final resolution of the coverage dispute by the courts. We hold that Kenneco sustained injury when coverage was denied and, therefore, limitations commenced on that date because all facts required for a cause of action existed at that time. *See Gilbreath v. White*, 903 S.W.2d 851, 856 (Tex.App.—Texarkana 1995, no writ) (holding that legal injury occurred for purposes of negligence action against insurance agent when insurance company rejected the claim); *see also Bush v. Ford Life Ins. Co.*, 682 So.2d 46, 47–48 (Ala.1996); *Plaza Bottle Shop v. Al Torstrick Ins. Agency*, 712 S.W.2d 349, 350 (Ky.Ct.App.1986).

---

3. When a prevailing party does not elect a measure of damages from among alternative measures, the court should render judgment based on the finding affording the greatest recovery. *Birchfield v. Texarkana Memorial Hosp.*, 747 S.W.2d 361, 367 (Tex.1987).

In *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d at 828, we held that when an insurer wrongfully denies coverage, the denial is the injury-producing event and, therefore, a cause of action for breach of the duty of good faith and fair dealing accrues when coverage is denied and not the date upon which the coverage suit is resolved. *See also Celtic Life Ins. Co. v. Coats*, 885 S.W.2d 96, 100 (Tex.1994) (holding that a cause of action under article 21.21 of the Insurance Code accrued on the date that insurer first denied coverage); *Long v. State Farm Fire & Cas. Co.*, 828 S.W.2d 125, 128 (Tex.App.—Houston [1st Dist.] 1992, writ denied) (holding that a cause of action under the DTPA accrues on the date that coverage is denied). We believe that the reasoning of *Murray* is equally applicable to Kenneco's negligence claim.

Although *Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 168 (Tex.1987), held that limitations on a bad faith claim does not begin to run until the underlying contract claims are finally resolved, that rule was expressly modified in *Murray* by our holding that limitations runs when coverage is denied because, at that time, the insured "ha[s] sufficient facts to seek a judicial remedy." *Murray*, 800 S.W.2d at 829. Kenneco's position that its negligence cause of action did not accrue until the underlying coverage dispute was resolved "is not consistent with the rule that limitations commences at the time facts come into existence which authorize a claimant to seek a judicial remedy." *Id.* Regardless of whether a coverage suit was ever filed against the London underwriters, sufficient facts existed when coverage was denied in March 1983 for Kenneco to seek a judicial remedy against J & H for negligence.

Kenneco's reliance on *Atkins v. Crosland*, 417 S.W.2d 150 (Tex.1967), is misplaced. *Atkins* involved a suit by a taxpayer against his accountant for negligence. We held that the statute of limitations did not begin to run against the taxpayer in that case until his tax deficiency was assessed by the IRS because "[p]rior to assessment the plaintiff had not been injured." *Id.* at 153. Kenneco, in contrast, was not only harmed when the London underwriters denied coverage on its claim, but also knew or should have known at that time that J & H might have been negligent. Thus, Kenneco's negligence cause of action accrued in March 1983, and the two-year limitations period had run when Kenneco and J & H signed the standstill agreement in 1986.

■ We also hold that equitable estoppel does not bar J & H's assertion of its limitations defense. The court of appeals, citing *Neeley v. Bankers Trust Co. of Texas*, 757 F.2d 621, 632 & n. 14 (5th Cir.1985), found the jury's affirmative answer to the following question to be equivalent to a finding of equitable estoppel:

> Was Kenneco's (Armada's) failure to take action before December 15, 1986 [the date of the standstill agreement], caused by J & H's knowingly engaging in conduct solely calculated to induce Kenneco (Armada) to refrain from or postpone filing suit?

921 S.W.2d at 263.

J & H argues that this question is an insufficient submission of equitable estoppel and that it was merely a submission of the 180-day limitations extension available under article 21.21, section 16(d) of the Insurance Code or section 17.565 of the DTPA. We agree. Section 16(d) provides:

> The period of limitation provided in this section may be extended for a period of 180 days if the person bringing the action proves that the failure to timely commence the action was caused by the defendant's *engaging in conduct solely calculated to induce the plaintiff to refrain from or postpone the commencement of the action.*

TEX. INS.CODE art. 21.21, § 16(d) (emphasis added). Section 17.565 of the DTPA contains virtually identical language. TEX. BUS. & COM. CODE § 17.565. Kenneco's question tracks the language of sections 16(d) and 17.565 almost verbatim and submits the exact question suggested by Pattern Jury Charge 102.23 for the 180-day extension under both statutes.

■ In contrast to that statutory language, the doctrine of equitable estoppel requires: (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should

be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations. *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 489 (Tex. 1991). Kenneco's jury question clearly does not address most of the equitable estoppel elements.[4] Even if the question could be characterized as a partial submission of the equitable estoppel issue, the language submitted is not "necessarily referable" to equitable estoppel and therefore should not be characterized as such on appeal. TEX.R. CIV. P. 279; *see also Martin v. McKee Realtors, Inc.*, 663 S.W.2d 446, 446 (Tex.1984); *Gold Kist, Inc. v. Carr*, 886 S.W.2d 425, 431 (Tex.App.—Eastland 1994, writ denied) (holding that jury question relating to breach of contract and fraud did not necessarily refer to promissory estoppel to the extent that defendant would be put on notice of possibility of deemed or express findings on that theory).

Furthermore, Kenneco's question was clearly submitted as part of the DTPA/Insurance Code claim—the jury was instructed not to answer it unless it found that J & H had engaged in an "unfair or deceptive act or practice" that was a producing cause of damages to Kenneco. The question was not submitted as an independent common-law issue. Therefore, the wording of the question and its placement after other questions concerning statutory claims reveal that it was an attempt to submit the 180–day extension issue, either under the Insurance Code or the DTPA. Because Kenneco's jury question *is* a correct submission of the statutory 180–day extension under the DTPA and Insurance Code, J & H could not have objected to the question as improperly submitted.

Further, holding that an affirmative answer to this jury question, which tracks the language of sections 16(d) and 17.565, is equivalent to a finding of equitable estoppel renders the 180–day extension language meaningless in actions under the DTPA and the new Insurance Code; anytime the question is submitted, a "yes" answer would arguably establish equitable estoppel and wholly preclude a defendant's limitations defense instead of just allowing the 180–day extension.

In sum, J & H is not estopped from asserting its limitations defense and Kenneco's negligence claim is barred by the statute of limitations.

### B. Insurance Code

#### 1. *Insurance Code vs. DTPA*

◼ Kenneco asserted causes of action under the DTPA and Insurance Code article 21.21. Under each cause of action, Kenneco argued incorporation of the other cause of action. On those issues, Kenneco submitted a single liability question to the jury:

> Did Johnson & Higgins engage in any unfair or deceptive act or practice in its dealings with Kenneco (Armada) on or about November 30, 1982?

The parties dispute whether this jury question is properly characterized as an Insurance Code claim or a DTPA claim. That determination must be made before considering the applicable statute of limitations.

J & H asserts that Kenneco abandoned its Insurance Code claim and submitted only a DTPA claim to the jury, and therefore the DTPA's two-year statute of limitations applies. J & H's position is not supported by the record. There is no indication that Kenneco waived the Insurance Code claim and proceeded only with its DTPA claim.

To support its position, J & H relies on the parties' repeated references to the cause of action submitted to the jury as dealing with "unfair or deceptive practices." J & H argues that such language refers to a DTPA cause of action and, thus, indicates that Kenneco submitted the claim under the DTPA. However, article 21.21 also deals with unfair or deceptive practices.

Article 21.21 is entitled "Unfair Competition and Unfair Practices." TEX. INS.CODE

---

4. *Neeley v. Bankers Trust Co. of Texas*, 757 F.2d 621 (5th Cir.1985), relied on by the court of appeals, is distinguishable because the question submitted in that case at least included the necessary elements of false representation, materiality, and reliance, and did not appear to be submitted as part of some other theory of recovery, whereas Kenneco's question was submitted as part of its Insurance Code/DTPA claim.

art. 21.21. Section 3 is captioned "Unfair methods of competition or unfair and deceptive acts or practices prohibited." *Id.* § 3. Section 16 provides a cause of action for persons injured by "unfair and deceptive acts or practices in the business of insurance." *Id.* § 16. Clearly, the reference to "any unfair or deceptive act or practice" in the jury question can refer to an Insurance Code claim as well as to a DTPA claim.

■ J & H also argues that because violations of article 21.21 are incorporated as violations of the DTPA, TEX. BUS. & COM.CODE § 17.50(a)(4), and because Texas courts have held that the DTPA limitations provision should be applied to all causes of action submitted under the DTPA, *see McAdams v. Capitol Prods. Corp.*, 810 S.W.2d 290, 292 (Tex.App.—Fort Worth 1991, writ denied), limitations bars this claim since Kenneco did not request that the trial court submit an Insurance Code claim as an alternative cause of action. J & H's argument fails to consider the fact that, while the DTPA does incorporate article 21.21, the converse is also true— article 21.21 incorporates certain practices delineated in the DTPA. *Aetna Cas. & Sur. Co. v. Marshall*, 724 S.W.2d 770, 772 (Tex. 1987). Thus, if both DTPA and Insurance Code violations are alleged, but only one cause of action is submitted, that claim is not automatically a DTPA claim.

We agree with Kenneco that the jury question is grounded in the Insurance Code because it mirrors the language of article 21.21. Pattern Jury Charge (PJC) 102.14 (1990 ed.), entitled "Question for Article 21.21 of the Insurance Code," was the form used for the jury question actually submitted. The jury question language "unfair or deceptive act or practice" tracks the language of article 21.21, section 16. Also, the definitions provided in the jury charge for "unfair or deceptive act or practice" [5] unmistakably resemble the Insurance Code. Definition (1) tracks the language of article 21.21, § 4(1) and submits PJC 102.16, entitled "Misrepresentation or False ·Advertising of Policy Contracts—Insurance." Definition (2) tracks the language of article 21.21, § 4(2) and submits PJC 102.17, entitled "False Information or Advertising—Insurance." Definition (3) tracks the language of Insurance Board Order No. 41060 and submits PJC 102.19, entitled "Misrepresentations—Insurance." Additionally, Question 12 ("What amount of the damages you found, if any, ... occurred before December 15, 1984 [two years before the date of the standstill agreement]?") is applicable only to causes of action under the pre–1985 Insurance Code, which excluded recovery for "damages incurred beyond a point two years prior to the institution of the action." TEX. INS.CODE art. 21.21, § 16(d) (Vernon 1981). This question would not have been submitted if the underlying liability claim concerned only the DTPA.

### 2. *Applicable Limitations Period*

■ Having determined that the claim submitted is sufficiently grounded in the Insurance Code, we must determine what statute of limitations applies to an Insurance Code cause of action that accrued prior to April 4, 1985. Under the current version of article 21.21, a party has two years from the date on which it discovered or should have discovered its cause of action in which to file suit. TEX. INS.CODE art. 21.21, § 16(d). However, before April 4, 1985, article 21.21 contained no express statute of limitations.[6]

**5.** "Unfair or deceptive act or practice" means any of the following:

(1) Making or causing to be made any statement misrepresenting the terms, benefits, or advantages of an insurance policy.

(2) Making, or directly or indirectly causing to be made, any assertion, representation, or statement with respect to insurance that was untrue, deceptive, or misleading.

(3) Making any misrepresentation relating to insurance. 'Misrepresentation' means any of the following:

(a) any untrue statement of a material fact; or

(b) any failure to state a material fact· that is necessary to prevent the statements from being misleading, when these statements are considered in light of the circumstances under which they are made; or

(c) the making of any statement in such manner or order as to mislead a reasonably prudent person to a false conclusion of a material fact.

**6.** Prior to the 1985 amendment, § 16(d) read: "In an action under this section, damages may not include any damages incurred beyond a point two years prior to the institution of the

TEX. INS.CODE art. 21.21, § 16(d) (Vernon 1981); Act of June 7, 1951, 52d Leg., R.S., ch. 491, § 1, 1951 Tex. Gen. Laws 868, 1075, *amended by* Act of April 4, 1985, 69th Leg., R.S., ch. 22, §§ 3, 4, 1985 Tex. Gen. Laws 395, 395–96. The date of accrual of the article 21.21 cause of action determines which version of the Insurance Code applies. *See Long v. State Farm Fire & Cas. Co.*, 828 S.W.2d 125, 128 (Tex.App.—Houston [1st Dist.] 1992, writ denied). The jury found, and Kenneco concedes, that its insurance claim accrued when coverage was denied in March 1983. Therefore, the pre–1985 version of article 21.21, section 16(d) applies to Kenneco's claim.

■ When a statute lacks an express limitations period, courts look to analogous causes of action for which an express limitations period is available either by statute or by case law. *See Tectonic Realty Inv. Co. v. CNA Lloyd's of Tex. Ins. Co.*, 812 S.W.2d 647, 655 (Tex.App.—Dallas 1991, writ denied); *Brooks Fashion Stores, Inc. v. Northpark Nat'l Bank*, 689 S.W.2d 937, 942 (Tex.App.—Dallas 1985, no writ). Texas courts of appeals have repeatedly analogized an article 21.21 cause of action to an action for breach of a written contract, thus applying the four-year statute of limitations applicable to actions for debt. *See, e.g., Long*, 828 S.W.2d at 128; *Tectonic*, 812 S.W.2d at 655; *Nash v. Carolina Cas. Ins. Co.*, 741 S.W.2d 598, 601 (Tex.App.—Dallas 1987, writ denied); *Gibbs v. Main Bank of Houston*, 666 S.W.2d 554, 558 (Tex.App.—Houston [1st Dist.] 1984, no writ). *See also* KALIS ET AL., POLICYHOLDER'S GUIDE TO THE LAW OF INSURANCE COVERAGE § 26.02[B], at 26–4 (1997)("Lawsuits seeking to enforce a coverage obligation typically are governed by the general statute of limitations applicable to actions on written contracts.")(citing *Franco v. Allstate Ins. Co.*, 505 S.W.2d 789, 793 (Tex.1974)). The court of appeals in this case cited *Long* and *Tecton-*

*ic* to reach the same conclusion. 921 S.W.2d at 262.

In deciding which limitations period applied to an article 21.21 claim that arose before April 4, 1985, the *Tectonic* court explained:

> The key question is whether to analogize article 21.21 claims to general tort actions, for which a two-year limitations period applied, or to actions for breach of a written contract, for which a four-year limitations period applied. Texas appellate courts interpreting article 21.21 have repeatedly analogized it to an action for breach of a written contract. As a result, the cases have applied the four-year limitations period normally available for actions to enforce a written contract.

*Tectonic*, 812 S.W.2d at 655 (citations omitted).

This reasoning is flawed, however, because it fails to consider that an article 21.21 claim is more analogous to a DTPA claim than to an action for debt on a written contract. As discussed in the preceding section in this opinion, Kenneco's article 21.21 claim is virtually indistinguishable from its DTPA claim. The language of section 17.50(a)(4) of the DTPA, by its terms, incorporates article 21.21 of the Insurance Code in its entirety. *Vail v. Texas Farm Bureau Mut. Ins. Co.*, 754 S.W.2d 129, 132 (Tex.1988). Similarly, article 21.21, section 16 makes actionable any violation of section 17.46 of the DTPA. *Aetna Cas. & Sur. Co. v. Marshall*, 724 S.W.2d 770 (Tex.1987). "The DTPA and the Insurance Code each grant relief for unfair or deceptive acts or practices in the business of insurance." *Vail*, 754 S.W.2d at 132.

We conclude that the close relationship between article 21.21 and section 17.50(a)(4) of the DTPA requires us to apply the two-year statute of limitations provision of the DTPA to Kenneco's article 21.21 claim. We disapprove of *Long v. State Farm Fire &*

action." TEX. INS.CODE art. 21.21, § 16(d) (Vernon 1981). This provision has been characterized as an exclusion on damages incurred more than two years before filing of the suit, rather than as a statute of limitations. *Tectonic Realty Inv. Co. v. CNA Lloyd's of Texas Ins. Co.*, 812 S.W.2d 647, 655 n. 4 (Tex.App.—Dallas 1991, writ denied). *But see Johnston v. Barnes*, 717

S.W.2d 164, 165 (Tex.App.—Houston [14th Dist.] 1986, no writ)(applying pre–1985 § 16(d) as a two-year limitations period). J & H admits that "[prior] to 1985, the Texas Insurance Code had no limitations provision, although it did have a provision that limited recoverable damages to those incurred within two years of the date the lawsuit is filed."

Cas. Co., 828 S.W.2d 125, 128 (Tex.App.—Houston [1st Dist.] 1992, writ denied); *Tectonic Realty Inv. Co. v. CNA Lloyd's of Tex. Ins. Co.*, 812 S.W.2d 647, 655 (Tex.App.—Dallas 1991, writ denied); *Nash v. Carolina Cas. Ins. Co.*, 741 S.W.2d 598, 601 (Tex. App.—Dallas 1987, writ denied); and *Gibbs v. Main Bank of Houston*, 666 S.W.2d 554, 558 (Tex.App.—Houston [1st Dist.] 1984, no writ); to the extent they differ from this conclusion.

Kenneco's article 21.21 cause of action accrued in March 1983. Kenneco and J & H signed their standstill agreement more than two years later on December 15, 1986. As a result, Kenneco's Insurance Code claims are barred by limitations.

## III. COLLATERAL ESTOPPEL

■ Kenneco's arguments indicate that it regards J & H's collateral estoppel plea as "offensive" collateral estoppel. However, J & H correctly argues that its invocation of the plea is, in fact, "defensive." Defensive collateral estoppel is utilized by defendants to prevent relitigation *by a plaintiff* of issues previously lost against another defendant. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329, 99 S.Ct. 645, 650–51, 58 L.Ed.2d 552 (1979); BLACK'S LAW DICTIONARY 261–62 (6th ed.1990). J & H's status as a "plaintiff" in the declaratory judgment action is purely nominal; J & H asserted its plea of collateral estoppel as a defense to Kenneco's claims for affirmative relief. *See Republic Ins. Co. v. Davis*, 856 S.W.2d 158, 164 (Tex.1993).

J & H asserts that all of Kenneco's claims in the state court action are barred by collateral estoppel.[7] The court of appeals concluded that collateral estoppel did not bar any of Kenneco's claims. Because Kenneco, then known as Armada, actually was a party in the first action, the critical collateral estoppel issues concern only whether: (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action, and (2) those facts were essential to

the judgment in the first action. *Sysco Food Servs., Inc. v. Trapnell*, 890 S.W.2d 796, 801 (Tex.1994); *Eagle Properties, Ltd. v. Scharbauer*, 807 S.W.2d 714, 721 (Tex.1990).

### A. Federal Court Findings

We must first ascertain exactly what issues were decided in the federal action to determine whether those findings might preclude Kenneco's claims in its state court action. Although Kenneco's federal action was brought against both the London and the Brazilian underwriters, for our purposes we need address only the claims against the London underwriters. J & H was not a party in the federal action; but, several of its employees were called to testify in that case.

The federal district court concluded that the London underwriters were not liable for contingency coverage. Kenneco argued that the back-to-back C.I.F. requirement was waived by the London underwriters' retention of Kenneco's premium. The district court rejected this argument, finding that the London underwriters did not waive their reservation of coverage, despite the fact that they received and retained the premium from Kenneco. As to J & H's conduct, the court stated, "[I]t appears that Johnson & Higgins did not clearly understand the situation and mistakenly billed Armada for a premium for contingency coverage." *Armada Supply*, 665 F.Supp. at 1062. The court further noted that "Johnson & Higgins billed Armada for the contingency coverage premium before the question of coverage was resolved." *Id.* at 1067. The court did not, however, determine whether J & H was or was not liable to Kenneco.

The federal district court also considered whether the London underwriters were liable for Kenneco's lost profits on the Sun contract under the increased value provision. The court reasoned that the increased value coverage included physical loss or damage to the cargo, but not the loss of a contract or its

---

**7.** In *Eagle Properties, Ltd. v. Scharbauer*, 807 S.W.2d 714, 721 (Tex.1990), we declined to decide whether state or federal collateral estoppel law governed the preclusive effect of a prior federal court judgment on a subsequent state court action because the same result would have been reached under either state or federal law. *See also Sysco Food Servs., Inc. v. Trapnell*, 890 S.W.2d 796, 805 (Tex.1994). The same is true in this case. Accordingly, we do not decide the issue today.

profits. *Id.* at 1051. The court squarely addressed Kenneco's argument that "even if the normal interpretation of [the coverage provision] would not allow recovery for loss of profits [on a contract], nevertheless there was a separate agreement to provide such coverage for this cargo." *Id.* at 1050. The district court held that no such separate agreement was made, explicitly finding that J & H "did not make an agreement binding the London underwriters ... to coverage of the lost profits on the Sun contract," that "[J & H] did not purport to make such an agreement," and that "[J & H] had neither actual nor apparent authority to do so." *Id.* at 1051. It is significant to note that these findings relate to the loss of profits coverage under the increased value provision and not to contingency coverage.

In its conclusions of law regarding increased value coverage, the federal district court phrased the issue as follows: "[Kenneco] contends that Johnson & Higgins agreed that the London insurance would cover lost profits on the Sun contract." *Id.* at 1058. The court "found as a fact that Johnson & Higgins did not purport to make any agreement to insure the Sun contract or the profits on that contract," and found that J & H had no actual or apparent authority to do so. *Id.* at 1066–67. Finally, the court concluded that, "as a matter of fact and law, no agreement was made at the November 30 meeting binding the London underwriters to insurance against loss of the Sun contract or the profits thereon." *Id.* at 1067.

The district court also made other specific findings about what occurred at the November 30 meeting. The court drew the distinction "between the concept of increasing the *insured value* based on the amount of a contract and the concept of insuring against the loss of a contract as such," finding that only the former was discussed at the November 30 meeting. *Id.* at 1059. The court also found that "Brown said nothing which apprised Anderson that [Kenneco] wished to have coverage that would depart from the normal marine insurance and would cover possible loss of a contract. Brown did not testify in words or substance that Anderson ever agreed to such a thing." *Id.* at 1059–60.

The court continued, "There ·is nothing in Anderson's testimony to indicate that he was agreeing to insure against the loss of the Sun contract or the profits on that contract. Certainly Anderson did not agree to something other than the normal particular average method of adjustment in the case of a contamination loss." *Id.* at 1061. Again, these conclusions by the court relate to lost profits under the increased value provisions rather than contingency coverage.

Kenneco appealed the district court's ruling to the Second Circuit. The Second Circuit generally affirmed the district court's findings regarding increased value coverage that: (1) Brown and Anderson did not discuss insurance against loss of profits for the Sun contract at the November 30 meeting; (2) Brown did not ask for, nor did Anderson agree to, coverage on lost profits; (3) Anderson's testimony was consistent with the London underwriters' position that the increased value coverage insured against cargo loss or damage rather than lost profits; (4) what was actually discussed was Kenneco's desire to "protect" its profits by utilizing the increased value coverage; and (5) Brown and Anderson did not discuss the difference between increasing the insured value based on the amount of the contract and insuring against the loss of a contract as such. *Armada Supply,* 858 F.2d at 851. The Second Circuit found that these findings were not clearly erroneous. *Id.* The court also reviewed and affirmed the finding that J & H lacked authority to bind the London underwriters. *Id.* Finally, the court explicitly upheld the district court's conclusion that "as a matter of fact and law, no agreement was made at the November 30 meeting binding the London underwriters to insurance against loss of the Sun contract or the profits thereon." *Id.*

The Second Circuit also upheld the district court's finding that the London underwriters were not liable for contingency coverage. *Id.* at 852. The court addressed Kenneco's claim "that the London underwriters' acceptance and retention of a premium for contingency coverage waived any objection they may have had to such coverage." *Id.* at 851. The court noted that the "evidence indicates that

J & H mistakenly billed Armada for [contingency] coverage before any question of coverage had been resolved and that the London underwriters denied coverage as soon as the facts of the transaction became fully known." *Id.* The court held that "the payment of a premium alone does not justify the rewriting of an insurance contract," reasoning that waiver cannot change coverage. *Id.* at 851–52. Thus, the court concluded that coverage could not be created "where none clearly existed." *Id.* at 852.

### B. Preclusion of Kenneco's Claims

 Collateral estoppel may preclude relitigation of issues previously litigated even though the subsequent suit is based upon a different cause of action. *Wilhite v. Adams,* 640 S.W.2d 875 (Tex.1982). If a cause of action in the second lawsuit involves an element already decided in the first lawsuit, that cause of action is barred. For this to be true, however, the issue decided in the first action must be actually litigated, essential to that lawsuit's judgment, and identical to the issue in the pending action. *Getty Oil v. Insurance Co. of N. Am.,* 845 S.W.2d 794, 802 (Tex.1992); *Eagle Properties,* 807 S.W.2d at 721–22; *Tarter v. Metropolitan Sav. & Loan Ass'n,* 744 S.W.2d 926, 927 (Tex.1988); *Van Dyke v. Boswell, O'Toole, Davis & Pickering,* 697 S.W.2d 381, 384 (Tex.1985). The federal courts have applied the same test. *See Interoceanica Corp. v. Sound Pilots, Inc.,* 107 F.3d 86, 91 (2d Cir.1997); *Levy v. Kosher Overseers Ass'n of America, Inc.,* 104 F.3d 38, 41 (2d Cir.1997); *Hicks v. Quaker Oats Co.,* 662 F.2d 1158, 1166 (5th Cir.1981).

Kenneco's state court claims include: (1) breach of contract, (2) Insurance Code violations, (3) common-law fraud, and (4) negligence. Kenneco's negligence and Insurance Code claims are barred by limitations. We hold that, to the extent Kenneco's remaining claims are based on lost profits coverage, they are barred by collateral estoppel and to the extent they are based on contingency coverage, they are not barred.

#### 1. *Breach of Contract Claims*

##### a. lost profits coverage

 Kenneco's claim for breach of the alleged agreement to secure lost profits coverage is barred by collateral estoppel. In its state court claim, Kenneco asserts that J & H "breached its agreement to provide the type of coverage it assured [Kenneco] it would secure." The jury question submitted asks, "Did Johnson & Higgins and Armada agree on November 30, 1982, that Johnson & Higgins would secure for Kenneco's (Armada's) benefit a policy of insurance protecting the profits on the sale of the cargo in question?" The instruction further clarifies that the jury was asked to "decid[e] whether the parties reached an agreement." That identical issue was previously decided against Kenneco in the federal action.

In the federal suit, Kenneco argued that J & H "specifically agreed" to lost profits coverage at the November 30 meeting. *Armada Supply,* 665 F.Supp. at 1057. Even a cursory reading of the federal district court's opinion demonstrates its finding that no such agreement to secure lost profits coverage was made. At least twice in its opinion, the court explicitly found that J & H neither made an agreement to insure the profits on the contract nor purported to make such an agreement. *Armada Supply,* 665 F.Supp. at 1051, 1066–67. The Second Circuit noted the district court's rejection of Kenneco's argument that the parties agreed to coverage of lost profits at the meeting, and affirmed the finding that "Brown did *not* ask for, nor did Anderson agree to, coverage on lost profits." *Armada Supply,* 858 F.2d at 847, 851. In order to succeed on its breach of contract claim in state court, Kenneco was required to establish that an agreement concerning lost profits coverage was made. That issue was already decided against Kenneco in the prior action. Thus, Kenneco's claim for breach of a contract to secure lost profits coverage is precluded if the claim was actually litigated and essential to the judgment in the federal action.

The issue concerning whether J & H agreed to secure lost profits coverage was actually litigated in the federal action because the issue was properly raised, submitted for determination, and determined. RE-STATEMENT (SECOND) OF JUDGMENTS § 27 cmt.

d (1982); *Van Dyke v. Boswell, O'Toole, Davis & Pickering,* 697 S.W.2d 381, 384 (Tex. 1985). The real question concerns the extent to which the federal district court's finding that no such agreement was made was essential to its judgment.

Kenneco argues that, because the federal district court's holding of no lost profits coverage was based on the alternative findings of no agreement and no authority, neither finding was "essential to the prior judgment." Section 27 of the *Restatement (Second) of Judgments* provides in part: "If a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone." *Id.* § 27, cmt. i (1982). Thus, according to the *Restatement,* the general rule is that there cannot be estoppel by alternative holdings.[8]

■ In response, J & H correctly asserts that both of the district court's findings can have a preclusive effect because both were reviewed and affirmed by the Second Circuit. An exception exists to the general rule of no preclusion when alternative holdings are appealed and affirmed. Comment o to the *Restatement* provides:

> If the judgment of the court of first instance was based on a determination of two issues, either of which standing independently would be sufficient to support the result, and the appellate court upholds both of these determinations as sufficient, and accordingly affirms the judgment, the judgment is conclusive as to both determinations. In contrast to the case discussed in Comment *i*, the losing party has here obtained an appellate decision on the issue, and thus the balance weighs in favor of preclusion.

RESTATEMENT (SECOND) OF JUDGMENTS § 27, cmt. o (1982). The district court's alternative findings of no agreement to insure the Sun contract and no authority to do so were both appealed and affirmed by the Second Circuit. The finding that no agreement was made to

cover the Sun contract profits was rigorously considered—the district court discussed this issue extensively in its findings of fact and conclusions of law. This finding was affirmed by the Second Circuit and could, standing independently, support the result of no coverage; it thus serves as a valid estoppel in this action.

Because we conclude that alternative findings that are in fact reviewed and affirmed by an appellate court may have preclusive effect, we need not address J & H's additional argument under *Eagle Properties, Ltd. v. Scharbauer,* 807 S.W.2d 714, 721 (Tex.1990), that estoppel is allowed for alternative holdings that were "rigorously considered" and sufficient to sustain the judgment.

### b. contingency coverage

■ Kenneco's claim for breach of the alleged agreement to secure "contingency coverage" is not barred by collateral estoppel. The issue sought to be litigated in this action, as framed by the submitted jury question, is: "Did Johnson & Higgins and Kenneco (Armada) agree on November 30, 1982, that Johnson & Higgins would secure for Kenneco's (Armada's) benefit 'contingency coverage'?" The jury found that such an agreement was made and awarded Kenneco $412,273.66.

Kenneco's cause of action for breach of an agreement to secure contingency coverage is not collaterally estopped because, in contrast to their consideration of whether J & H agreed to secure lost profits coverage, the federal courts never addressed whether an agreement was made to secure contingency coverage.

It is undisputed that Brown went to J & H to obtain "back up" insurance in the event the Brazilian underwriters failed to pay on a claim. It is also undisputed that Anderson told Brown such coverage could be triggered by the policy's already existing "contingency coverage." The federal district court found that the contingency coverage did not apply because: (1) the sale was not back-to-back

---

**8.** The Second Restatement states a rule different from that of the First Restatement, which provided that each independently sufficient alternative

basis for the prior judgment was a valid estoppel. RESTATEMENT (FIRST) OF JUDGMENTS § 68 cmt. n (1942).

C.I.F., and (2) the London underwriters did not waive the coverage requirements. *Armada Supply,* 665 F.Supp. at 1051, 1067. Thus, the district court's finding that the policy's contingency coverage did not apply to the sale does not preclude a finding by the jury in the state action that Anderson agreed to secure contingency coverage.

Collateral estoppel is not proper because the issue decided in the federal action is not identical to the issue Kenneco litigated as a basis for the contingency coverage breach of contract claim in the state court. *See Getty Oil,* 845 S.W.2d at 802. Similarly, the ult'-mate issues in Kenneco's state action "were neither expressly nor necessarily adjudicated" in the federal action nor were the federal court findings inconsistent with the state court findings. *See Tarter v. Metropolitan Sav. & Loan Ass'n,* 744 S.W.2d 926, 928 (Tex.1988).

The federal courts never decided whether J & H agreed to secure contingency coverage. Kenneco's assertions in the federal courts regarding contingency coverage were mainly that events *after* the November 30 meeting (*e.g.,* the underwriters' receiving and retaining premiums for contingency coverage) resulted in a waiver of the back-to-back C.I.F. requirement. *Armada Supply,* 665 F.Supp. at 1061–63, 1067–68, 1061 ("[Kenneco] claims that during the course of later events the London underwriters waived the requirement of the cover note."). In contrast, the jury question in the state action focused only on whether J & H agreed *on November 30* to secure coverage. The issue of whether J & H mistakenly billed Kenneco for premiums after the London underwriters disputed coverage is not identical to whether Anderson agreed on November 30 to secure contingency coverage.

Further, the federal district court's statements regarding the state of knowledge of both parties as to the nature of the sale from Kenneco to Sun (*i.e.,* that it was not back-to-back C.I.F.) should not support collateral estoppel. These statements were not affirmed on appeal and were not essential to the district court's holdings that the sale was not covered and that the back-to-back C.I.F. requirement was not waived. Not every fact

finding in the district court's opinion may be afforded preclusive effect. To allow such broad preclusion would eviscerate the requirement that the finding be essential to the judgment in the prior suit. *Bonniwell v. Beech Aircraft Corp.,* 663 S.W.2d 816, at 818–19 (Tex.1984); *Eagle Properties,* 807 S.W.2d at 721–22.

In federal court, Kenneco argued that the C.I.F. back-to-back requirement was not a material term of the cover note and that the underwriters waived the requirement because they retained the contingency premium. The district court made three inquiries that were essential to its holding of no contingency coverage: (1) whether the back-to-back C.I.F. requirement of the cover note was a material term; (2) if so, whether it was satisfied; and (3) if not satisfied, whether the London underwriters waived that requirement by accepting and retaining the premium. The district court concluded that it was a material term, it was not satisfied, and that it was not waived. Although the district court stated that "Anderson understood Brown to say" that the sale was back-to-back C.I.F. and that Kenneco did not "affirmatively state" until December 1992 that the sale to Sun was delivered, what Brown said and what Anderson knew or understood regarding the sale to Sun were not essential to the district court's holding. *Armada Supply,* 665 F.Supp. at 1061–62.

Regarding Kenneco's "claim that the underwriters waived the requirement of the cover note because they received and retained the 'contingency' premium," the district court made two alternative holdings. *Id.* at 1067. First, it concluded that waiver could not rewrite the requirements of the policy. *Id.* Then, it stated, "In any event, the evidence does not support the conclusion that the London underwriters waived their objections to coverage through retention of a premium." *Id.* The district court's statement that "it appears that Johnson & Higgins did not clearly understand the situation and mistakenly billed Armada for a premium for contingency coverage," *id.* at 1062, was not essential in its evaluation of whether the conduct of the underwriters resulted in waiver. The district court focused on the fact

that the London underwriters reserved decision on the contingency coverage, did not waive their position after J & H billed Kenneco for premiums, and plainly denied coverage when the facts were fully known. *Id.* at 1067–68. Thus, J & H's billing actions did not affect the London underwriters' position. If J & H's act of billing Kenneco was irrelevant to the determination of no waiver, surely J & H's state of mind in so doing was also irrelevant.

Simply put, the facts relevant to the contingency claims in this case were not identical to the facts decided in the federal case and were not essential to the federal court's holding. Therefore, the contingency coverage breach of contract claim is not collaterally estopped.

### 2. *Common-law Fraud*

In the state action, the court submitted the following question to the jury:

> Did Johnson & Higgins misrepresent Kenneco's (Armada's) insurance coverage with the London underwriters at the November 30, 1982, meeting?

The question did not differentiate between the increased value coverage and the contingency coverage, although the pleadings alleged that Anderson misrepresented Kenneco's coverage under both provisions. The jury answered affirmatively and awarded Kenneco $1.5 million in damages.

The elements of common-law fraud are that: (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with the intention that it be acted upon by the other party; (5) the party acted in reliance upon the representation; and (6) the party suffered injury. *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 222 (Tex.1992); *Eagle Properties,* 807 S.W.2d at 723.

J & H argues that Kenneco's fraud claim is estopped because Kenneco contended in the federal action that Anderson misrepresented coverage under the London policy, and the federal district court found against Kenneco on that issue. To support its position, J & H points to the federal district court's statement that "[Kenneco] contends that [J & H] agreed that the London insurance would cover lost profits on the Sun contract." 665 F.Supp. at 1058. J & H further argues that Kenneco relies on the same arguments and facts that it relied on in federal court to now support its fraud claim.

Kenneco responds that its fraud claim could not be estopped by the prior action because, in the federal action, it contended that Anderson did *not* misrepresent coverage because J & H *correctly* represented the coverage under the London policy, whereas here its position is that J & H *did* misrepresent coverage. Further, Kenneco argues that the federal suit was nothing more than a contract construction suit, and therefore the federal court's determination of that suit should have no bearing on Kenneco's fraud claim.

We hold that, to the extent that Kenneco's fraud claim is based on its allegation that Anderson knowingly or recklessly represented that Kenneco's lost profits on the contract were insured by the increased value provision, it is barred by collateral estoppel. Kenneco's state court fraud claim necessarily involves proof that a representation was made, and that that representation was false. Although Kenneco never contended that Anderson or J & H *mis*-represented coverage in the federal courts, Kenneco did contend that Anderson made certain representations regarding lost profits coverage, and the federal courts rejected that contention. In fact, the Second Circuit specifically characterized the issue being decided as "whether the London underwriters were bound by the alleged *representations* of J & H, a Houston broker, that the insurance would cover lost profits." *Armada Supply,* 858 F.2d at 851 (emphasis added). Even Kenneco's own brief states that "Kenneco offered evidence concerning representations made by Anderson of [J & H] as to the extent of coverage" for lost profits. Thus, insofar as Kenneco's fraud claim is based on an alleged representation by Anderson that Kenneco's lost profits were covered, the claim is barred

by the federal courts' conclusion that no such representation was made.

However, Kenneco's allegation that Anderson knowingly or recklessly represented that Kenneco "was fully insured for any loss to which the Brazilian underwriters did not respond under the 'contingency' clause" is not barred because that issue was not decided in the federal suit. The federal courts made no findings that would preclude a verdict in favor of Kenneco on this claim, and the jury's findings are not inconsistent with the federal courts' findings.

### C. Full and Fair Litigation

■ Kenneco argues that the federal court's findings should not be afforded preclusive effect because of the alignment of the parties in the federal action. Kenneco asserts that it had no real incentive in the federal action to develop testimony against J & H, because J & H was participating on Kenneco's behalf. Thus, according to Kenneco, there was no full and fair litigation of issues relating to J & H's conduct, and the alignment of the parties created a situation in which J & H's conduct was not rigorously considered.

J & H responds that the alignment of the parties should not negate the collateral estoppel effect of the federal court's findings. J & H admits that it assisted Kenneco in asserting its claim against the London underwriters, and even testified on Kenneco's behalf in federal court as to how the claim should be adjusted. However, J & H claims it did not align itself with Kenneco concerning the events of the November 30 meeting. J & H asserts that the issue of what occurred at the meeting and what Anderson said or did was "drawn" through the conflicting testimony of Anderson and Brown and through the dispute over that issue between Kenneco and the London underwriters.

We agree with J & H and hold that J & H's involvement in the prior action as a witness on behalf of Kenneco does not extinguish the collateral estoppel effect of the federal court's findings. There would be no question as to the preclusive effect of those findings had J & H not participated in the prior action. Kenneco's argument that it had no incentive to litigate against J & H fails because that is not the test: the proper inquiry is whether Kenneco had incentive to litigate the *issue* of Anderson's representations regarding lost profits coverage at the November 30 meeting. *See Sysco Food Servs., Inc. v. Trapnell,* 890 S.W.2d 796, 802 (Tex.1994) ("When the issue is properly identified, it becomes clear that this issue was fully and fairly litigated in the federal action."). Kenneco had every incentive to prove that Anderson made the alleged representations concerning increased value coverage; Kenneco's recovery for lost profits in the federal coverage suit depended upon such a finding. What Anderson said regarding lost profits coverage was fully aired in the federal courts through the testimony of Brown and Anderson and through the conflicting positions of Kenneco and the London underwriters regarding those representations. *See Armada Supply,* 665 F.Supp. at 1050 ("London underwriters ... den[y] that Johnson & Higgins purported to make such an agreement."). Thus, the issue of what Anderson said at the November 30 meeting was fully and fairly litigated in the federal courts.

■ Kenneco also argues that collateral estoppel should not apply because the "procedural opportunity" of a jury trial was unavailable in the New York action, citing Federal Rule of Civil Procedure 38(e). The mere fact that Kenneco could not avail itself of this opportunity does not, in and of itself, preclude an application of defensive collateral estoppel. Further, the United States Supreme Court has previously rejected the position that collateral estoppel violates a party's Seventh Amendment right to a trial by jury. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 333–37, 99 S.Ct. 645, 652–55, 58 L.Ed.2d 552 (1979). While the question remains open as a matter of Texas constitutional law, *see Sysco Food Servs.,* 890 S.W.2d at 801 n. 7, Kenneco has not raised any argument under the Texas Constitution in this Court, and therefore we will not consider the question. *See Tilton v. Marshall,* 925 S.W.2d 672, 677 n. 6 (Tex.1996).

## IV. DISPOSITION

■ After application of J & H's limitations and collateral estoppel defenses, Kenneco's remaining jury awards include fraud ($1,500,000.00) and breach of contract ($412,273.66), both of which relate to the contingency coverage issue. When a prevailing party does not elect a measure of damages from among alternative measures, courts should render judgment based on the finding affording the greatest recovery. *Birchfield v. Texarkana Memorial Hosp.*, 747 S.W.2d 361, 367 (Tex.1987). Although the fraud claim provides the greatest recovery, Kenneco is not entitled to recover on the jury's fraud award because there is no evidence to support the jury's finding that J & H knowingly or recklessly misrepresented Kenneco's contingency coverage.

### A. Fraud

■ The contingency coverage provisions in Kenneco's insurance policy provided that "where the Assured purchase goods on C.I.F. terms and sell on C.I.F. terms, but wish to give their buyer a certificate for their Sales Price ... they may issue certificates for the full value hereunder." Thus, the contingency coverage policy language required a C.I.F. purchase and a C.I.F. sale. Kenneco contends that Anderson, on behalf of J & H, committed fraud by representing on November 30 that the contingency coverage applied even though Brown had informed Anderson that the sale to Sun was on a delivered basis, not C.I.F. J & H responds that, even if Anderson misrepresented the contingency coverage, there is no evidence that he made the misrepresentation knowingly or recklessly. According to J & H, Anderson was, at worst, negligent.

■ A statement is not fraudulent unless the speaker knew it was false when made or the speaker made it recklessly without knowledge of the truth. *Prudential Ins. Co. v. Jefferson Assocs.*, 896 S.W.2d 156, 163 (Tex.1995). Proof that a defendant made a statement knowing of its falsity or without knowledge of its truth may be proved by direct or circumstantial evidence. *See Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex.1986).

The evidence of the events surrounding the November 30 meeting is as follows: Brown visited J & H's offices to discuss insurance coverage for the tanker cargo, already en route from Rio de Janeiro to New York. Kenneco's normal account representative was on vacation, so Brown met with Anderson, a cargo claims adjuster. Anderson testified that, because he was not familiar with the language of the contingency coverage provision, he obtained a copy of Kenneco's policy and read the provision aloud at the meeting, including the language requiring back-to-back C.I.F. sales. Brown testified that she clearly informed Anderson that the sale to Sun was on a delivered basis, and that Anderson told her that the contingency coverage applied nonetheless. Anderson admitted telling Brown that Kenneco had contingency coverage, but testified that Brown had incorrectly informed him that Kenneco's deal was back-to-back C.I.F., which would trigger contingency coverage. Anderson's contemporaneous notes of the meeting reflected that Kenneco's purchase was C.I.F., but the notes were silent regarding the sale to Sun. Anderson testified that December 22, 1982, when Brown sent documentation reflecting that the Sun sale was delivered, was the first time he was informed that the sale to Sun was not C.I.F. Despite that knowledge, Anderson did not inform Kenneco or the London underwriters of the potential problem with contingency coverage. Instead, he calculated the premium and billed Kenneco even though he admittedly knew at that time that coverage was "highly improbable." Anderson testified that J & H billed Kenneco for the premium to avoid difficulty in processing a claim for lack of payment, and that J & H at all times advocated to the London underwriters that there was contingency coverage.

Construing the evidence in the light most favorable to Kenneco and disregarding all contrary evidence and inferences, *see Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 458 (Tex.1992), we conclude that although Anderson did in fact misrepresent Kenneco's coverage, there is no evidence that he made the misrepresentation knowingly or recklessly. Clearly Kenneco has provided no direct

evidence, such as Anderson's notes or a memorandum, indicating that Anderson intentionally or recklessly misled Brown and Kenneco. Thus, Kenneco's claim must be supported, if at all, by circumstantial evidence. But there is no circumstantial evidence that Anderson knowingly misrepresented the coverage. Brown herself discounted such a theory, testifying that "[i]n retrospect I believe that [Anderson] didn't appreciate the difference [between a C.I.F. sale and a delivered sale]." Further, there is no evidence to support a motive for Anderson to intentionally misrepresent the coverage. In contrast, Anderson testified that, had he obtained coverage other than the existing contingency coverage, J & H would have received a better premium. Thus, there is no evidence that Anderson acted knowingly.

▮ Further, there is no evidence that Anderson recklessly misrepresented the coverage. A speaker acts recklessly if he makes representations "without any knowledge of the truth and as a positive assertion." *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 222 (Tex.1992). In other words, a representation is recklessly made if the speaker knows that he does not have sufficient information or basis to support it, *Trenholm v. Ratcliff,* 646 S.W.2d 927, 933 (Tex. 1983), or if he realizes that he does not know whether or not the statement is true. *Custom Leasing, Inc. v. Texas Bank & Trust Co.,* 516 S.W.2d 138, 142 (Tex.1974) (citing RESTATEMENT OF RESTITUTION § 8 (1957)). This standard might apply if Anderson, with no familiarity of the policy language, had told Brown that the coverage applied without consulting the policy itself. It is undisputed that that is not the case. Anderson realized his ignorance of the policy language, and obtained a copy of the policy and read it over with Brown in an effort to answer her concerns. *See Jauregui v. Jones,* 695 S.W.2d 258, 263–64 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.) (finding no fraud when defendant made investigation before making assertion). Thus, the evidence does not indicate that Anderson made the representation "without any knowledge of the truth." At most, it establishes that Anderson should have known that his representations may have been incorrect; such evidence, however,

is akin to negligent misrepresentation, not fraud. *See Federal Land Bank Ass'n v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991) (standard for negligent misrepresentation is that defendant "did not exercise reasonable care or competence in obtaining or communicating the information").

Lastly, we do not believe that Anderson's conduct weeks after the loss occurred constitutes evidence that he acted fraudulently at the November 30 meeting. Taking all reasonable inferences favorable to Kenneco, Anderson's conduct establishes, at most, that he was reluctant to admit his mistake. That is not evidence of fraud.

### B. Breach of Contract

▮ J & H also challenges the legal sufficiency of the jury's award for breach of contract to secure contingency coverage. Specifically, J & H argues that there is no evidence that it agreed to secure contingency coverage. We hold that there is some evidence to support the jury's finding, and therefore Kenneco is entitled to judgment on this claim.

Both Anderson and Brown testified that Brown went to J & H on November 30, 1982 seeking, among other things, insurance against the possibility that the Brazilian underwriters would not pay on a claim by Kenneco. Brown testified several times that she told Anderson that the transaction for which the additional insurance was sought "was a C.I.F. purchase and a delivered sale."

Brown further testified that:

[T]he end result was he [Anderson] agreed that it [the additional coverage] would cover exactly what we were looking for, the type of purchase we had and type of sale we had. He knew I told him that it was a delivered sale, so that he was well aware that it was not a C.I.F. back-to-back but was a purchase sale.

When asked whether she was "telling the Court and jury that when you left Johnson and Higgins you were convinced that you had the protection that you went there specifically to get," Brown succinctly and unequivocally testified: "Without a doubt." J & H

charged, and Kenneco paid, a premium for this insurance.

Anderson testified that he sold Brown contingency coverage and told her he would make the declarations. He further agreed that he would have expected her to believe that she had contingency coverage after the meeting, and that it was possible for him to convince the underwriters to grant coverage for the sale even were it not back-to-back C.I.F.

Although Anderson claims that Brown indicated to him that the transaction was C.I.F. back-to-back, Brown explained that "on a back-to-back transaction, Armada [Kenneco] would never have any risk at all," and consequently no need for the contingency coverage which Anderson actually procured for Kenneco. Either Anderson sold Kenneco insurance that it did not need; or, contrary to his later position, he actually agreed to sell Kenneco the additional coverage that Brown claims she requested.

This is legally sufficient evidence to support the jury's verdict. Therefore, Kenneco is entitled to recover on its claim for breach of contract to secure contingency coverage, in the amount of $412,273.66.

## V. PREJUDGMENT INTEREST

We next consider the proper method of calculating prejudgment interest under *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 552 (Tex.1985). Pre-

judgment interest is "compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Id.* at 552 (citing McCormick, *Damages*, § 50 (1935)); *see also* TEX.REV.CIV. STAT. art. 5069–1.01(a). There are two legal sources for an award of prejudgment interest: (1) general principles of equity and (2) an enabling statute. *Cavnar,* 696 S.W.2d at 552; *Phillips Petroleum Co. v. Stahl Petroleum Co.,* 569 S.W.2d 480, 483–85 (Tex.1978).

J & H argues that any award of prejudgment interest in this case is governed by TEX.REV.CIV. STAT. article 5069–1.05, section 6, or, alternatively, that we should defer to the policy underlying section 6 even if it does not expressly apply. Kenneco argues that *Cavnar* controls this case and that general principles of equity govern the award of prejudgment interest. We hold that this case is governed by the common law rather than by statute; however, we conform *Cavnar*'s common-law rule with the legislative policy established by section 6.[9]

In *Cavnar,* this Court overruled eighty-eight years of judicial precedent and adopted a rule allowing recovery of prejudgment interest on personal injury, wrongful death, and survival actions. *See generally* Cloud, Note, *Cavnar v. Quality Control Parking, Inc.: Prejudgment Interest is Now Recoverable in Personal Injury, Wrongful Death and Survival Action Cases,* 38 BAYLOR

9. Effective September 1, 1997, article 5069–1.05 was codified in Chapter 304 of the Texas Finance Code. *See* Act of May 24,1997, 75 th Leg., R.S., ch. 1008, § 1, 1997 Tex. Sess. Law Serv. 3435. No substantive change in law was intended by the codification. TEX. FIN. CODE § 1.001(a); Act of May 24, 1997, 75 th Leg., R.S., ch. 1008, § 7 & preamble, 1997 Tex. Sess. Law Serv. 3091, 3603. It appears that the prejudgment language in the Texas Finance Code was then superseded by the subsequent enactment of similar prejudgment interest language in the Texas Credit Title, Act of June 2, 1997, 75 th Leg., R.S., ch. 1396, § 1, 1997 Tex. Sess. Law Serv. 5212–13. *See* TEX. GOV'T CODE § 311.031(c) ("The repeal of a statute by a code does not affect an amendment, revision, or reenactment of the statute by the same legislature that enacted the code. The amendment, revision, or reenactment is preserved and given effect as part of the code provision that revised the statute so amended, revised, or reen-

acted.") & § 311.031(d) ("If any provision of a code conflicts with a statute enacted by the same legislature that enacted the code, the statute controls."). *See also Miller v. State,* 708 S.W.2d 436, 446 (Tex.Crim.App.1984) (holding that amendment to statute controlled when same Legislature amended statute and also enacted a new code that omitted the amendment).

The codification and subsequent reenactment of what has been TEX.REV.CIV. STAT. article 5069–1.05, section 6 does not modify the legislative policy established by section 6. We believe the legislative underpinnings of section 6 extend to that section's codification in the Texas Finance Code and its subsequent reenactment in the Texas Credit Title.

In any event, at the time the trial court's judgment was rendered in this case, section 6 was the operative provision. As a result, the opinion will refer to section 6 rather than to the Texas Finance Code or the Texas Credit Title.

L.REV. 385 (1986). The decision to extend prejudgment interest recovery to such cases was driven primarily by the rationale that awarding prejudgment interest was necessary to fully compensate injured plaintiffs. *Cavnar*, 696 S.W.2d at 552.

*Cavnar* established that a prevailing plaintiff may recover prejudgment interest, compounded daily (based on a 365–day year), on damages that accrued by the time of judgment. *Id.* at 554. The starting date for accrual of prejudgment interest on claims governed by *Cavnar* was "six months after the occurrence of the incident giving rise to the cause of action,"[10] and the rate of interest was to be computed under TEX.REV.CIV. STAT. article 5069–1.05, section 2[11] on the date of judgment. *Cavnar*, 696 S.W.2d at 554. *Cavnar* involved claims for personal injury, but its application has been expanded to non-personal injury scenarios. *See, e.g., Perry Roofing Co. v. Olcott*, 744 S.W.2d 929, 930 (Tex.1988) (breach of contract action for damages unascertainable from contract); *Rio Grande Land & Cattle Co. v. Light*, 758 S.W.2d 747, 748 (Tex.1988) (same); *City of Houston v. Wolfe*, 712 S.W.2d 228, 229 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd) (eminent domain).

In fashioning its prejudgment interest rule, the *Cavnar* Court was primarily concerned with advancing two ends: (1) encouraging settlements and (2) expediting both settlements and trials by removing incentives for defendants to delay without creating such incentives for plaintiffs. *Cavnar*, 696 S.W.2d at 554–55; *see also Perry Roofing*, 744 S.W.2d at 930.

In 1987, two years after *Cavnar* was issued, the Texas Legislature passed a comprehensive package of legislation known as "tort reform." *See generally* Sanders & Joyce, *"Off to the Races": The 1980s Tort Crisis and the Law Reform Process*, 27

HOUSTON L.REV. 207 (1990). Part of the tort reform legislation added section 6 to article 5069–1.05.

Section 6 somewhat codified and modified the *Cavnar* rule by providing that "[j]udgments in wrongful death, personal injury, and property damage cases must include prejudgment interest." TEX.REV.CIV. STAT. art. 5069–1.05, § 6(a). However, under this section, the time period during which prejudgment interest accrues is shorter than under *Cavnar*. Instead of beginning six months after the date of the incident, section 6 provides that prejudgment interest generally begins to accrue on the earlier of (1) 180 days after the date the defendant receives written notice of a claim or (2) the day the suit is filed. *Id.* Section 6(g) states that "[t]he rate of prejudgment interest shall be the same as the rate of postjudgment interest at the time of judgment." But, interest "shall be computed as simple interest." *Id.* § 6(g). Section 6 also provided other modifications to the *Cavnar* rule, such as tolling accrual of prejudgment interest as to the amount of a settlement offer during its pendency, allowing a trial court the discretion to order accrual or nonaccrual during periods of delay caused by a defendant or a plaintiff, and allowing prejudgment interest for future damages included in the judgment. *Id.* §§ 6(a)-(d).

■ J & H takes the position that section 6's calculation rules apply to all judgments, and therefore apply to any judgment awarded to Kenneco. Kenneco argues that the plain language of section 6 applies only to wrongful death, personal injury, and property damage cases. The courts of appeals have split on this question. *Compare e.g., Kuehnhoefer v. Welch*, 893 S.W.2d 689, 694 (Tex. App.—Texarkana 1995, writ denied) *and Texas Commerce Bank v. Lebco Construc-*

**10.** For survival actions, interest accrual was to begin on either the date of death or six months after the injury-causing accident occurred, whichever yielded the larger interest award. *Cavnar*, 696 S.W.2d at 555.

**11.** Section 2 provided that the interest rate should be computed by "taking the auction rate quoted on a discount basis for 52–week treasury bills issued by the United States government as

published by the Federal Reserve Board on the most recent date preceding the date of computation," except that "if the rate so computed is less than 10 percent, the judgment interest rate shall be 10 percent, and if it be more than 20 percent, the judgment interest rate shall be 20 percent." TEX.REV.CIV. STAT. art. 5069–1.05, § 2 (Vernon 1987). The most recent version of section 2 is virtually identical. *Id.* (Supp.1997).

*tors, Inc.,* 865 S.W.2d 68, 84 n. 13 (Tex. App.—Corpus Christi 1993, writ denied)(holding that statute has application beyond those actions listed) *with Spangler v. Jones,* 861 S.W.2d 392, 397–98 (Tex.App.—Dallas 1993, writ denied); *and H.E. Butt Grocery Co. v. Bay, Inc.,* 808 S.W.2d 678, 680 (Tex.App.—Corpus Christi 1991, writ denied)(holding that statute only applies to actions specifically enumerated). We hold that section 6 means what it says: statutory prejudgment interest applies only to wrongful death, personal injury, and property damage cases.

The Legislature's codification and modification of *Cavnar* did not purport to provide a statutory framework for prejudgment interest in all cases. *See Spangler,* 861 S.W.2d at 398. The limited application of section 6 is evident from the statute's plain language, especially when viewed in the context of other sections of article 5069–1.05. Whereas section 2 provides that interest shall accrue on "all judgments," section 6 provides only that statutory prejudgment interest must be awarded for "[j]udgments in wrongful death, personal injury, and property damage cases." Tex.Rev.Civ. Stat. art. 5069–1.05 §§ 2, 6(a). Further, the Legislature later added section 7, which specifically allows for prejudgment interest in condemnation cases. *Id.* § 7. Surely if section 6 were applicable to all judgments, the addition of section 7 would have been superfluous.

■ Given that section 6 is expressly limited to wrongful death, personal injury, and property damage cases, we must next determine whether Kenneco's claims fall within any of those categories. Clearly the only potentially applicable category would be property damage. We have concluded that Kenneco is entitled to recover only on its breach of contract claim. Although the contract concerned insurance coverage for damages to Kenneco's property by a third party, Kenneco does not base its suit on that property damage. Instead, Kenneco's claims are for purely economic losses stemming from J & H's breach of contract to secure contingency coverage. Such claims do not fall within the scope of "property damage cases," which only include claims for damage to tangible property, not economic loss or loss of economic opportunity. *See Spangler,* 861 S.W.2d at 398; *Associated Telephone Directory Publishers, Inc. v. Five D's Publishing Co.,* 849 S.W.2d 894, 900 (Tex.App.—Austin 1993, no writ); *Ralston Purina Co. v. McKendrick,* 850 S.W.2d 629, 633 (Tex. App.—San Antonio 1993, writ denied). Thus, section 6 does not apply to this case, and any award of prejudgment interest is governed by the common law.

J & H argues that, even if section 6 does not expressly apply, this Court should adopt the Legislature's views, expressed in its enactment of section 6, concerning the appropriate balancing of interests. Specifically, J & H argues that this Court could follow the policy of section 6 and hold that, under the common law, prejudgment interest should begin to accrue on the earlier of 180 days after a defendant receives written notice of a claim or the day suit is filed, and that it should be calculated as simple interest. Kenneco responds that *Cavnar* requires both daily compounding and accrual beginning six months after the occurrence giving rise to the cause of action. *Cavnar,* 696 S.W.2d at 554–55.

■ When the Court decided *Cavnar,* there was no statute governing prejudgment interest. *See* Act of May 8, 1967, 60th Leg., R.S., ch. 274, § 2, 1967 Tex. Gen. Laws 608, 610; Tex.Rev.Civ. Stat. art. 5069–1.05 (Vernon 1987). Thus, the *Cavnar* Court fashioned its rule without the guidance of legislative policy. The enactment of section 6 involved many of the same policy concerns underlying the decision in *Cavnar.* Section 6 is a "trade-off provision," effectuating some of the goals of tort reform while preserving the availability of prejudgment interest under *Cavnar,* and even expanding the scope of recoverable interest to include future damages awarded as part of the judgment. *C & H Nationwide, Inc. v. Thompson,* 903 S.W.2d 315, 326–27 (Tex. 1994) (citing Montford & Barber, *1987 Texas Tort Reform: The Quest for a Fairer and More Predictable Texas Civil Justice System,* 25 Houston L.Rev. 59, 102 (1988)). Section 6 works as a "system of rewards and penalties" intended to encourage settle-

ments. *C & H Nationwide,* 903 S.W.2d at 326. This Court has recognized the importance of such a goal, and today we adopt the Legislature's approach to effectuating that goal. *See Owens–Illinois, Inc. v. Estate of Burt,* 897 S.W.2d 765, 769 (Tex.1995) (adopting a prejudgment interest accrual rule for latent-injury cases "consistent with the prejudgment interest statute"); *cf. Smith v. Merritt,* 940 S.W.2d 602, 604–05 (Tex.1997) (fashioning a common-law social host liability rule in accordance with legislative policy of Dram Shop Act). We adopt the Legislature's approach to prejudgment interest and hold that, under the common law, prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed. *See* TEX. REV.CIV. STAT. art. 5069–1.05, § 6(a).

▮ Applying these time frames, Kenneco argues that December 15, 1986, the date the tolling agreement was signed, is the equivalent of the date of suit, and therefore should be the date of accrual. We disagree. The tolling agreement is not a lawsuit, nor did it provide that it would be considered the date of suit for any purpose.

Alternatively, Kenneco argues that prejudgment interest began to accrue on June 13, 1987, 180 days from the date the tolling agreement was signed. J & H counters that interest did not begin to accrue until April 15, 1988, 180 days after J & H received Kenneco's DTPA notice letter. Thus, we must determine whether the standstill agreement constitutes "written notice of a claim" that triggers accrual of prejudgment interest.

The standstill agreement plainly says that "Kenneco asserts that, to the extent underwriters are found not to be liable [in the federal action] ..., J & H is liable to Kenneco for the amounts which Kenneco has claimed under the Policy." We hold that the agreement constitutes "written notice of a claim." A "claim" is "a demand for compensation or an assertion of a right to be paid." *See Robinson v. Brice,* 894 S.W.2d 525, 528

(Tex.App.—Austin 1995, writ denied); *see also* BLACK'S LAW DICTIONARY 247 (6th ed.1991) (a "claim" is a "demand for money or property as of right"). Through the standstill agreement, J & H received written notice that Kenneco was claiming a right to compensation. *See Robinson,* 894 S.W.2d at 529 (claimant not required to demand exact amount or list every element of damage). Moreover, J & H had sufficient information at that time to obtain a settlement without incurring any prejudgment interest at all. *See Owens–Illinois, Inc. v. Estate of Burt,* 897 S.W.2d 765, 769 (Tex.1995) ("[A] defendant must have notice and an opportunity to settle a claim in order to advance *Cavnar's* objective of expedited settlements.").

▮ The purpose of a standstill agreement is normally to maintain the status quo and temporarily suspend or stop all aspects of a suit. In most circumstances, this would operate to toll the accrual of prejudgment interest while the agreement is in effect. However, parties to a standstill agreement may contractually provide otherwise.

The standstill agreement in this case expressly preserves all of Kenneco's rights and all of J & H's liabilities. The terms of the agreement provide: "The period between December 15, 1986 and the date when 30 days shall have elapsed following the final determination of the New York Action ... shall not be counted for purposes of the statute of limitations, laches or any other defense which may be asserted in any subsequent action." The agreement continues, "Except as expressly provided [in the previous sentence], nothing in this agreement, or the recitals set forth herein, shall prejudice, influence or in any way affect any rights, liabilities, defenses, counterclaims or setoffs which may be asserted by either party hereto in this or any other proceeding." Thus, the standstill's application is narrow—it applies only to limitations, laches, and other defenses. All of Kenneco's rights, which include prejudgment interest, were expressly reserved.[12] Thus, prejudgment interest ac-

---

**12.** The standstill agreement was silent with regard to prejudgment interest. The parties easily could have included a provision that prejudgment interest would abate during the specified standstill time period. Absent such provision, this court cannot imply one. *Tenneco Inc. v. Enterprise Products Co.,* 925 S.W.2d 640, 646 (Tex.1996).

crued beginning 180 days from the date the standstill agreement was signed.

We further hold that prejudgment interest accrues at the rate for postjudgment interest and it shall be computed as simple interest. *See* TEX.REV.CIV. STAT. art. 5069–1.05, § 6(g). There has been much confusion among Texas courts regarding how prejudgment interest should be calculated in cases following *Cavnar*. *Crum & Forster, Inc. v. Monsanto Co.*, 887 S.W.2d 103, 153 (Tex. App.—Texarkana 1994, writ dism'd by agrmt). Although the majority of appellate court cases have held that equitable prejudgment interest awards should be compounded daily, even after the enactment of section 6, *see, e.g., Spangler*, 861 S.W.2d at 398–99; *Shell Pipeline Corp. v. Coastal States Trading, Inc.*, 788 S.W.2d 837, 848–49 (Tex.App.—Houston [1st Dist.] 1990, writ denied), we hold that equitable prejudgment interest should be computed in accordance with the legislative policy supporting section 6. The Legislature expressly provided that statutory prejudgment interest shall be computed as simple interest. TEX.REV.CIV. STAT. art 5069–1.05, § 6(g). We will follow the Legislature's lead and hold that equitable prejudgment interest shall be computed as simple interest.

Adoption of the statutory approach to prejudgment interest continues to promote the policy goals underlying the *Cavnar* decision. For example, the accrual rule of section 6 effectively encourages settlements without creating incentives for plaintiffs to delay. In contrast to section 6, where interest begins to accrue 180 days after a defendant receives notice of the claim or the claim is filed, *Cavnar* interest begins to accrue 180 days after the occurrence giving rise to the claim, regardless of whether a defendant knows of the claim. Allowing plaintiffs to accrue prejudgment interest even before the defendant becomes aware of the claim is at odds with

the principle we recognized in *Owens–Illinois, Inc. v. Estate of Burt*, 897 S.W.2d 765, 769 (Tex.1995), that "[o]bviously, a defendant must have notice and an opportunity to settle a claim in order to advance *Cavnar*'s objective of expedited settlements and trials."

In *Estate of Burt*, the *Cavnar* accrual rule required an exception in cases of latent injury because the date of the occurrence of the incident giving rise to the cause of action was often difficult to determine. In adopting an accrual date beginning when a defendant receives notice or suit is filed, we reasoned that such an accrual rule provides sufficient compensation for plaintiffs, establishes a definite date for accrual to begin, encourages expedited settlements and trials, and removes incentives for defendants to delay without creating such incentives for plaintiffs. *Id.* at 769. Section 6—and, now, the new common law rule—effectively serve each of those policy goals even when the date of accrual of the cause of action can be readily determined.

Applying the computation rules of section 6 to the common law also serves the goal of compensating plaintiffs, without overcompensating them or simultaneously punishing defendants. Although the rate of prejudgment interest is the same under *Cavnar* and section 6, *Cavnar*'s daily compounding allows plaintiffs far greater recovery than under section 6. It is not uncommon for *Cavnar* prejudgment interest awards to greatly exceed the amount of the actual judgment, as is true in this case where the actual damages awarded were $1,972,273.66 and the prejudgment interest award was $2,750,952.39. Further, *Cavnar* often allows for a larger recovery of interest than the plaintiff could have received by investing the money himself, thereby overcompensating the plaintiff. The computation rules of section 6 serve to more

The dissent distorts our conclusion by stating that we are holding that J & H *"contracted to pay interest* during such period [the period of the standstill]" and that J & H *"agreed to pay Kenneco prejudgment interest* for the delay Kenneco requested." 962 S.W.2d at 534 (emphasis added). The stipulation does not reference interest, prejudgment or otherwise. The agreement does, however, expressly preserve the "rights and liabilities" of the parties. Kenneco has the legal

right to prejudgment interest and J & H has the legal liability to pay prejudgment interest—unless otherwise stipulated. Contrary to the dissent, J & H does not have an inherent "right not to pay interest" during the stipulation period. That "right," which may exist under a general stipulation, was eliminated because the stipulation protected the full scope of Kenneco's rights and J & H's liabilities.

accurately reflect the damages incurred by the plaintiff for the lost use of money.

Finally, conforming the common law to legislative policy serves the important goal of restoring uniformity to the law of prejudgment interest. In *Cavnar*, we reasoned that "[t]he time has come to revise the prejudgment interest rule ... and restore equity and symmetry to this area of the law." *Cavnar*, 696 S.W.2d at 553–54. Given the Legislature's enactment of section 6, that time has come again. *Cavnar* was a wrongful death case and, by its express language, applied to personal injury, wrongful death, and survival action cases. *Id.* Thus, while *Cavnar's* application has expanded beyond those specific causes of action, it is the context of those causes of action in which the rule was fashioned. The enactment of section 6, however, precludes the application of *Cavnar* to some of those very claims, if they accrue after September 2, 1987. The result is that section 6 applies one rule to personal injury, wrongful death, and property damage cases, while *Cavnar* applies a different rule, and only in cases *not* involving personal injury, wrongful death, and property damage. Such a result is as illogical as it is arbitrary, and is therefore no longer the law in Texas.

Our common law prejudgment interest holding applies to all cases in which judgment is rendered on or after December 11, 1997, and to all other cases currently in the judicial process in which the issue has been preserved.

\* \* \* \* \*

We conclude that limitations bars Kenneco's negligence and Insurance Code claims and that there is no legally sufficient evidence to support Kenneco's fraud claim concerning contingency coverage. We further hold that collateral estoppel bars all of Kenneco's claims concerning an alleged agreement to secure lost profits coverage and the related fraud claims. We sustain, in part, J & H's point of error regarding the calculation of prejudgment interest. We overrule J & H's other points of error.

Therefore, we conclude that Kenneco is entitled to recover $412,273.66 from J & H on its claim for breach of contract to secure contingency coverage, plus attorney's fees in the amount of $300,000 as stipulated by the parties. Kenneco is also entitled to recover prejudgment interest on its $412,273.66 breach of contract award, calculated as simple interest, accruing beginning 180 days from December 15, 1986, as well as postjudgment interest and costs as allowed by law. We accordingly modify the judgment of the court of appeals and remand the cause to the trial court for the calculation of the amount of prejudgment interest and for rendition of judgment in accordance with this opinion.

HECHT, Justice, filed a dissenting opinion, in which GONZALEZ and OWEN, Justices, join, and in Part II of which SPECTOR, Justice, joins.

HECHT, Justice, dissenting.

I do not disagree with the Court that prejudgment interest awards on common law contract claims should be guided by legislated policies for prejudgment interest on wrongful death, personal injury, and property damage claims. No good reason is advanced for having different prejudgment interest rules for different kinds of claims. In deference to the Legislature's adoption of a rule for some cases, it is appropriate for the common law to apply the same rule in other cases. I do disagree with the Court's holding that prejudgment interest should accrue during a period when the parties have agreed to take no action. Neither of the two purposes of prejudgment interest—encouraging prompt settlements and discouraging delay by defendants—can be served when parties agree to allow *the plaintiff* to delay deciding whether to file suit. The Court's argument that the plaintiff in this case reserved by agreement a right to prejudgment interest that it would not have had otherwise—in other words, that the defendant contracted to pay prejudgment interest for plaintiff's delay in filing suit—can hardly be taken seriously.

But I would not reach the prejudgment interest issue because I conclude that Kenneco Energy, Inc. (formerly Armada Supply Inc.) is not entitled to judgment against Johnson & Higgins of Texas, Inc. on any

claim Kenneco asserts. I agree with the Court that Kenneco's negligence claim is barred by limitations,* that there is no evidence to support Kenneco's fraud claim, and that Kenneco's claims for breach of contract based on Johnson & Higgins' failure to obtain lost profits coverage are precluded by findings in *Armada Supply Inc. v. Wright,* 665 F.Supp. 1047 (S.D.N.Y.1987), *aff'd in part and rev'd in part,* 858 F.2d 842 (2d Cir.1988). Contrary to the Court, however, I would hold that Kenneco's contract claims for Johnson & Higgins' failure to obtain contingency coverage are also precluded by the federal court's findings. Thus, I would render judgment for Johnson & Higgins.

Accordingly, I respectfully dissent.

## I

Kenneco bought fuel oil from Petrobras in Rio de Janeiro for resale to Sun Oil Trading Corp. in New York. Kenneco's purchase price was the market value of the oil upon arrival in New York harbor. The resale to Sun was at a fixed contract price, which Kenneco hoped would be higher than the prevailing market price at the time of delivery. Kenneco's purchase was on a C.I.F. basis, meaning that although Kenneco took title to the oil in the Brazilian port, Petrobras was obliged to insure the oil during its voyage to New York. Kenneco's resale of the oil was not on a C.I.F. basis, so that it had no obligation to Sun Oil to insure the cargo during shipment. But while the oil was en route, a steep and steady decline in the fuel oil market moved Kenneco to obtain additional insurance to protect what appeared would very likely be a very substantial profit from the resale to Sun.

Kenneco's concerns were two. Petrobras had provided insurance from Brazilian underwriters for 110% of the purchase price, but because the purchase price was tied to the market, as the market fell, so did the amount of insurance, leaving a large part of the potential value of the oil at resale—and al-

most all of Kenneco's profits—uninsured. Kenneco sought to insure the oil at Sun's higher contract price. Kenneco was also concerned that the Brazilian underwriters might fail to pay a claim and so sought insurance against that contingency. Through its insurance broker, Johnson & Higgins, Kenneco sought assurance that its marine insurance policies issued by London underwriters would provide both increased value coverage and contingency coverage.

When the ship arrived in New York, the cargo was found to be contaminated, and some of it had been lost. Sun canceled the contract, and eventually Kenneco sold some of the oil at a reduced price. The London and Brazilian underwriters disputed Kenneco's claims, so Kenneco sued them—but not Johnson & Higgins—in the United States District Court for the Southern District of New York. In essence, the London underwriters contended that the increased value coverage applied only to damages from the destruction of the oil and not to damages from Sun's cancellation of the contract, and that the contingency coverage applied only if Kenneco's purchase and resale were both on C.I.F. terms, and its sale to Sun was not. Kenneco argued that Johnson & Higgins had agreed to provide Kenneco with the coverage it claimed, and that because Johnson & Higgins was the London underwriters' agent, the underwriters were bound by that agreement.

The federal district court's finding that Johnson & Higgins was not the London underwriters' agent was sufficient reason to deny Kenneco's claims, but the court went further. It also found, in the words of the Second Circuit on appeal, that Kenneco "did *not* ask for, nor did [Johnson & Higgins] agree to, coverage on lost profits" as Kenneco contended. *Armada,* 858 F.2d at 851. This Court holds, and I agree, that because the federal district court's findings of no agency and no agreement regarding increased value coverage were both affirmed

---

\* The Court holds that Kenneco's negligence action accrued when the insurer denied coverage, not when the lack of coverage was finally adjudicated years later. Johnson & Higgins does not argue for a different accrual date. I do not read the Court's opinion to foreclose the position, had

it been argued, that Kenneco's negligence claim accrued even earlier, when Johnson & Higgins failed to provide the coverage Kenneco claims it requested, but that limitations was tolled until coverage was denied.

on appeal, relitigation of either is barred by collateral estoppel. RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. o (1982). But contrary to the Court, I believe a fair reading of the federal district court's opinion shows that it also found that Johnson & Higgins did not agree to provide the contingency coverage Kenneco requested, and that finding, too, was affirmed on appeal.

The federal district court found that Johnson & Higgins' representative, Anderson, did not know because Kenneco's representative, Brown, did not tell him that Kenneco's sale to Sun was not on C.I.F. terms. Specifically, the federal district court found:

- "She [Brown] did not state what she told Anderson about whether the Sun contract was or was not C.I.F." *Armada*, 665 F.Supp. at 1059.

- "As to the question of coverage under the contingency clause, Anderson understood Brown to say that both the Petrobras–Armada sale and the Armada–Sun sale were C.I.F. sales. As already stated, this was contrary to the fact." *Id.* at 1061.

- "It is important to note that [it was not until after the meeting between Brown and Anderson and after the dispute arose], according to evidence in this case, that Armada had affirmatively stated that the sale to Sun was on a delivered, rather than a C.I.F. basis." *Id.* at 1062.

Anderson could not have agreed to provide contingency coverage despite the fact that the sale to Sun was not on C.I.F. terms when, as the federal court found, Anderson understood from what Brown told him that the sale to Sun *was* on C.I.F. terms. In other words, Anderson could not have agreed to provide coverage he did not even know was being requested. Thus, the federal district court found that "Johnson & Higgins did not clearly understand the situation and mistakenly billed Armada for a premium for contingency coverage." *Id.* at 1062. The Second Circuit approved this finding. *Armada*, 858 F.2d at 851 ("The evidence indicates that [Johnson & Higgins] mistakenly billed Armada for this coverage...."). If Johnson & Higgins did not understand that Kenneco was requesting coverage even though the

sale to Sun was not on C.I.F. terms, it could hardly have agreed to provide such coverage.

A simpler example makes the point clearer. Suppose a person wants an automobile policy that applies throughout Mexico, but he does not tell the agent, and the agent understands from what the person says that the car will not be operated in Mexico. The agent procures a policy that clearly limits coverage to operations in the United States. When the insured is involved in an accident in Mexico City, how can he successfully claim that the agent agreed to provide coverage? Once it is established that the agent did not know the automobile would be operated in Mexico, that fact precludes an agreement to provide such coverage.

The federal district court expressly found that Kenneco did not tell Johnson & Higgins that it wanted contingency coverage for a transaction that did not involve back-to-back sales on C.I.F. terms, Johnson & Higgins understood from Kenneco that the transaction *did* involve back-to-back sales on C.I.F. terms, and Johnson & Higgins provided an insurance certificate that clearly conditioned coverage on back-to-back sales on C.I.F. terms. These facts having been determined, Johnson & Higgins cannot be said to have agreed to provide the contingency coverage Kenneco claims it wanted, or to have represented that it would provide such coverage. Had the federal district court concluded otherwise, it would not have been necessary to address, as it did, Kenneco's argument that the back-to-back C.I.F. requirement was waived.

Kenneco had full opportunity to litigate in its federal suit whether Johnson & Higgins agreed to provide contingency coverage applicable in Kenneco's circumstances. It could not prevail on its claim against the London underwriters without proving either a representation by Johnson & Higgins that it would obtain the coverage, or a waiver of the back-to-back C.I.F. sales requirement. Having lost on both grounds, it should not be allowed to relitigate the issue in Texas.

## II

"The purpose of a standstill agreement," the Court explains, "is normally to maintain

**536**

the status quo and temporarily suspend or stop all aspects of a suit. In most circumstances, this would operate to toll the accrual of prejudgment interest while the agreement is in effect." *Ante* at 531. Prejudgment interest encourages early settlements and discourages delay by defendants. Obviously, a plaintiff who wishes to maintain the status quo can hardly complain of a defendant's delay or failure to settle. A plaintiff should not be entitled to prejudgment interest for a delay he has requested and agreed to.

The Court nevertheless holds that Kenneco should recover prejudgment interest while the standstill agreement was in effect because Johnson & Higgins contracted to pay interest during such period. One would naturally think that if anyone should pay for a delay in the running of limitations requested by the plaintiff, it should be the plaintiff. While it is certainly possible that a defendant might agree not only to delay the running of limitations but also to pay a plaintiff interest for that delay, no reason for such an agreement suggests itself, and the Court supplies none. The Court's position is simply that by the language of their agreement, Johnson & Higgins agreed to pay Kenneco prejudgment interest for the delay Kenneco requested, strange as that may seem. The only language to which the Court points is this:

> Except as expressly provided, nothing in this agreement, or the recitals set forth herein, shall prejudice, influence or in any way affect any rights, liabilities, defenses, counterclaims or setoffs which may be asserted by either party hereto in this or any other proceeding.

By this language both parties attempted to preserve their rights. Since as a general rule, according to the Court, a defendant would not owe prejudgment interest while a standstill agreement was in effect, Johnson & Higgins should have preserved its right not to pay interest for that period, and Kenneco had no right to interest to be preserved. The Court simply changes the phrase, "which may be asserted by *either party* ", to "which may be asserted by Kenneco". Misconstrued, the language does not preserve each party's rights but gives Kenneco more rights

than it would otherwise have had and takes away a right of Johnson & Higgins'.

Had the quoted sentence been omitted, the Court would hold that Kenneco had no right to prejudgment interest during the period of the standstill agreement:

> That "right" [not to pay prejudgment interest during a standstill period], which may exist under a general stipulation, was eliminated because the stipulation protected the full scope of Kenneco's rights and J & H's liabilities.

*Ante* at 531 n. 12. That is, Johnson & Higgins' preservation of the full scope of its rights under a standstill stipulation means that it preserved all but one, the right not to pay prejudgment interest during the period. The absurdity of this Orwellian doublespeak and consequent result is lost on the Court.

