TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-05-00822-CV






InsureSuite, Inc., Appellant


v.


MJS Marketing, L.P., Appellee






FROM THE COUNTY COURT AT LAW NO. 2 OF TRAVIS COUNTY, 

NO. 284311, HONORABLE J. DAVID PHILLIPS, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N




 This is a restricted appeal from a no-answer default judgment awarding appellee MJS
Marketing, L.P. $30,750 in damages, plus prejudgment interest and attorney's fees. In three issues,
appellant InsureSuite, Inc. challenges the trial court's personal jurisdiction over it; the factual
sufficiency of evidence supporting the award of damages, including prejudgment interest; and the
absence of findings that MJS satisfied statutory prerequisites for recovery under its Deceptive Trade
Practices-Consumer Protection Act ("DTPA") claim. See Tex. Bus. & Com. Code Ann. §§ 17.41-.63 (West 2002 & Supp. 2005). We affirm. 


FACTUAL BACKGROUND


 The following facts are alleged in MJS's original petition and taken as true in light
of InsureSuite's default. See Morgan v. Compugraphic Corp., 675 S.W.2d 729, 732 (Tex. 1984). 
MJS is a Texas limited partnership in the business of supplying Internet advertising services to its
customers. MJS provides such services by purchasing e-mail addresses in bulk from sellers who
agree to place MJS's copy on their own Web sites--a process called "co-registration"--and forward
to MJS the e-mail addresses of persons who visit the sellers' Web sites and elect to receive
communications from MJS. If visitors elect to receive MJS communications, (1) the seller forwards
their information to MJS for a price. MJS benefits from this system by obtaining current information
and e-mail addresses from persons willing to be contacted, which it can then aggregate into lists
through which it can e-mail advertisements and offers. But, MJS further alleged, "it is crucially
important to obtain current information and valid e-mail addresses only from persons who are willing
to be contacted. Invalid e-mail addresses and addresses for persons who have not chosen to be
contacted are of no use to MJS."

 InsureSuite is a Delaware corporation whose "home office and principal place of
business" is "600 N. Brand Blvd., Glendale, CA 91203-4207." InsureSuite contacted MJS in
October 2003, offering to sell the personal information and e-mail addresses of visitors to its Web
site, www.insuresuite.com, (2) who agreed to let MJS contact them. MJS "told InsureSuite that it did
not want and would not pay for 'bundled' e-mail addresses [those obtained from other sellers or
obtained in other ways, such as from bulletin boards or chat rooms]," but wanted only e-mail
information from current visitors to www.insuresuite.com who were willing to be contacted by MJS. 
InsureSuite indicated that it could produce approximately 300,000 valid co-registration e-mail
addresses each month. Based on these representations, MJS agreed to pay InsureSuite for each
address that InsureSuite provided. MJS's petition states that it "would not have entered into this
agreement but for InsureSuite's representations that the e-mail addresses it received from
InsureSuite would be only from those current addresses provided by visitors to InsureSuite's
[www].insuresuite.com website who were willing to be contacted by MJS."

 By the summer of 2004, MJS began noticing that a large number of the e-mail
addresses it was receiving from InsureSuite were duplicating addresses MJS already had. Later, MJS
discovered that 90 percent of e-mail addresses from InsureSuite duplicated addresses provided by
another seller. A subsequent independent audit of the data revealed that many of the e-mail
addresses were subscribed from either unrouted or unroutable IP (Internet protocol) spaces. MJS
also determined that the traffic at www.insuresuite.com was not sufficient to yield the number of e-mail addresses InsureSuite had been providing. These facts enabled MJS to deduce that InsureSuite
had not been providing it genuine e-mail addresses actually obtained through www.insuresuite.com,
and had done so "knowingly and fraudulently." MJS "estimates that it has paid InsureSuite over
$30,750 for worthless e-mail addresses obtained from sources other than the agreed-upon website."


PROCEDURAL HISTORY


 MJS filed suit against InsureSuite, alleging fraud, breach of contract, and DTPA
violations. It alleged under each claim that InsureSuite's conduct caused it "at least $30,750" in
actual damages. Because the suit arose out of business conducted in Texas but InsureSuite does not
have a place of business in this state and has not designated an agent for service in this state, MJS
served InsureSuite by substitute service on the Secretary of State. See Tex. Civ. Prac. & Rem. Code
Ann. § 17.044 (b) (West 1997). On April 4, 2005, the Secretary of State issued a certificate, filed
in the record, stating that (1) the citation and MJS's original petition were received by his office on
March 17, 2005; (2) his office forwarded the citation and the petition to InsureSuite on March 22,
2005, by certified mail, return receipt requested to "InsureSuite, Inc., 600 N Brand Blvd, Glendale,
CA 91203-4207"; and (3) the Secretary of State received the return receipt, bearing the signature of
addressee's (InsureSuite's) agent, on March 28, 2005.

 InsureSuite did not file an answer. A damages trial was held on June 15, 2005, at
which InsureSuite did not appear. The trial court heard evidence of MJS's damages in the form of
an affidavit from Michael Scotty, manager of the general partner of MJS. In addition to echoing the
liability allegations in MJS's petition, Scotty's affidavit states that "MJS paid $30,750 for these e-mail addresses" and that 


when InsureSuite failed to live up to its agreement by providing fraudulent e-mail
addresses and addresses that were not obtained from current visitors to the
www.insuresuite.com website, and when InsureSuite intentionally and knowingly
misrepresented the amount, source, validity, and authenticity of the e-mail addresses
that it promised to provide, MJS was damaged in the amount of $30,750.00.



 The trial court rendered judgment awarding MJS $30,750.00, plus $470.10 in
prejudgment interest, "calculated at the rate of 6 percent per annum, uncompounded, from March
14, 2005," the date suit was filed, "until the date judgment is signed." The court also awarded
attorney's fees.

DISCUSSION


 InsureSuite brings three issues on appeal. In its first issue, InsureSuite contends that
citation and service were defective, preventing the trial court from acquiring personal jurisdiction
over it. Alternatively, InsureSuite contends that, if the trial court did have personal jurisdiction, the
evidence was factually insufficient to support the damages award. In its third issue, InsureSuite
argues that the trial court erred in awarding damages because it failed to make findings that all
conditions precedent under the DTPA were satisfied.


Standard and scope of review

 A restricted appeal is available only if: 


1. The appeal is brought within 6 months of the date of judgment


2. by a party to the suit


3. who did not participate at trial; and


4. error must be apparent from the face of the record.



Tex. R. App. P. 26.1(c) (West 2003); Quaestor Invs., Inc. v. State of Chiapas, 997 S.W.2d 226, 227
(Tex. 1999). MJS agrees that InsureSuite has satisfied the first three requirements, so we need only
address whether error is apparent on the face of the record. The "face of the record" consists of all
papers on file in the appeal, including the reporter's record. Norman Communications v. Texas
Eastman, Co., 955 S.W.2d 269, 270 (Tex. 1997).

 The scope of our review is the same as in ordinary appeals; that is, we review the
entire case. Id. This includes evidentiary sufficiency claims. Id.

Personal jurisdiction

 A trial court can render a default judgment only if it has personal jurisdiction over the
defendant and the case is ripe for judgment. Finlay v. Jones, 435 S.W.2d 136, 138 (Tex. 1968). 
This requires the trial court to determine that the defendant was properly served with citation and
that there is no answer on file. Id. at 139. A default judgment cannot withstand direct attack by a
defendant who demonstrates that he was not served in strict compliance with applicable
requirements. Wilson v. Dunn, 800 S.W.2d 833, 836 (Tex. 1990). Presumptions of valid issuance,
service, and return of citation do not apply in a default judgment. Primate Constr., Inc. v. Silver, 884
S.W.2d 151, 152 (Tex. 1994). 

 To sustain a judgment against an out-of-state defendant served by substituted service
through the Secretary of State, the record must show that the Secretary of State complied with the
requirements of the long-arm statute. GMR Gymnastics Sales, Inc. v. Walz, 117 S.W.3d 57, 59 n.
1 (Tex. App.--Fort Worth 2003, pet. denied). The long-arm statute provides, in relevant part, that
if the Secretary of State is served with process for a non-resident, the documents "shall contain a
statement of the name and address of the nonresident's home or home office and the secretary of
state shall immediately mail a copy of the process to the nonresident at the address provided." Tex.
Civ. Prac. & Rem. Code Ann. § 17.045(a) (West Supp. 2005). 

 Proof of proper service under the long-arm statute can be satisfied by a certificate
from the Secretary of State. Campus Invs., Inc. v. Cullever, 144 S.W.3d 464, 466 (Tex. 2004);
Capitol Brick, Inc. v. Fleming Mfg. Co., 722 S.W.2d 399, 401 (Tex. 1986); Whitney v. L & L Realty
Corp., 500 S.W.2d 94, 96 (Tex. 1973). In fact, "[a]bsent fraud or mistake, the Secretary of State's
certificate is conclusive evidence that the Secretary of State, as agent of [the defendant], received
service of process for [the defendant] and forwarded the service as required by the statute." Capitol
Brick, 722 S.W.2d at 401.

 Here, the Secretary of State issued a certificate dated April 4, 2005, stating that his
office received "a copy of the Citation and [MJS's] Original Petition. . . ." The certificate also states
that a copy was forwarded to InsureSuite, by certified mail, return receipt requested, and that his
office received the return receipt, signed by InsureSuite's agent, on March 28, 2005. This certificate
conclusively establishes that the Secretary of State received service of process for InsureSuite and
forwarded it to InsureSuite as required by the long-arm statute. Capitol Brick, 722 S.W.2d at 401.

 However, facts showing defective citation through substituted service may be brought
in a restricted appeal. See Wright Bros. Energy, Inc. v. Krough, 67 S.W.3d 271, 272-73 (Tex.
App.--Houston [1st Dist.] 2001, no pet.). InsureSuite contends that service was defective here
because the address on the Secretary of State's certificate omits the floor number on which its office
is located and thereby incorrectly states its business address. But there is nothing on the face of the
record that shows that the address on the Secretary of State's certificate is incorrect. Wolfe v. Grant
Prideco, Inc., 53 S.W.3d 771, 774 (Tex. App.--Houston [1st Dist.] 2001, pet. denied) (holding that,
although court clerk sent notice to address in central register instead of address on pleadings, nothing
in record showed address was incorrect on date notice was sent); Robert S. Wilson Invs. No. 16, Ltd.
v. Blumer, 837 S.W.2d 860, 862 (Tex. App.--Houston [1st Dist.] 1992, no writ) (holding no error
on face of record because nothing in record established post office box address was not correct
mailing address).

 InsureSuite also contends that service is defective because the Secretary of State's
certificate fails to state that the address to which service was sent is the home or home office of
InsureSuite. We disagree. The long arm statute requires:


If the secretary of state is served with duplicate copies of process for a nonresident,
the documents shall contain a statement of the name and address of the nonresident's
home or home office and the secretary of state shall immediately mail a copy of the
process to the nonresident at the address provided.



Tex. Civ. Prac. & Rem. Code Ann. § 17.045(a) (West Supp. 2005). Here, MJS provided a copy of
the original petition to the Secretary of State. The petition states that service of process should be
forwarded to InsureSuite "at InsureSuite's home office and principal place of business, 600 N Brand
Blvd, Glendale, CA 91203-4207." The Secretary of State's certificate states that it received a copy
of the citation and original petition, that a copy was forwarded to InsureSuite at 600 N Brand Blvd,
Glendale, CA 91203-4207, and that it received the return receipt bearing the signature of addressee's
agent. This is evidence that the documents containing a statement of the home office address were
received in compliance with the long-arm statute. Cf. World Distribs., Inc. v. Knox, 968 S.W.2d 474,
477-78 (Tex. App.--El Paso 1998, no pet.) (holding service was defective because petition did not
allege and nothing in record established that address provided was home address); Whiskeman v.
Lama, 847 S.W.2d 327, 330 (Tex. App.--El Paso 1993, no writ) (holding citation defective because
petition did not allege address provided was home or home office address and nothing in record
showed it was home address); Verges v. Lomas & Nettleton Fin. Corp., 642 S.W.2d 820, 823 (Tex.
App.--Dallas 1982, no writ) (holding citation defective because petition provided "last known
address" which is not equivalent to "home address").

 Concluding that there is nothing on the face of the record that demonstrates defective
service, we overrule InsureSuite's first issue. 


Damages

 In its second issue, InsureSuite claims that the evidence was factually insufficient to
support the trial court's judgment for unliquidated damages. It does not dispute legal sufficiency. 
In a factual sufficiency review, an appellate court must consider and weigh all the evidence, and
should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as
to be wrong and unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).

 Once a default judgment is taken, all allegations set forth in the petition are deemed
admitted, except the amount of unliquidated damages. Texas Commerce Bank, N.A. v. New, 3
S.W.3d 515, 516 (Tex. 1999). The trial court must hear evidence regarding unliquidated damages. 
Tex. R. Civ. P. 243; Holt Atherton Indus., Inc. v. Heine, 835 S.W.2d 80, 83 (Tex. 1992). Damages
can be established through affidavit testimony. New, 3 S.W.3d at 516. Although affidavits are
hearsay, unobjected-to hearsay constitutes probative evidence and satisfies the requirement for
evidence of unliquidated damages. Id. at 517. The amount due under a written instrument can be
proven by testimony. Id. Additionally, a plaintiff in a default judgment must present evidence of
a "causal nexus" between the basis of the suit and the alleged injuries. Morgan, 675 S.W.2d at 732.

 The only evidence of damages is the affidavit of Michael Scotty. Scotty testified that
MJS paid $30,750.00 to InsureSuite and was damaged in this amount by InsureSuite's actions. He
also supplied a causal nexus between MJS's claims and its injuries, stating that MJS's damages were
caused by InsureSuite "intentionally and knowingly misrepresent[ing] the amount, source, validity,
and authenticity of the e-mail addresses that it promised to provide . . . ."

 InsureSuite insists that this testimony is factually insufficient proof of damages
because it does not supply a basis for awarding benefit-of-the-bargain damages to MJS; specifically,
the value actually received by MJS. From the factual allegations in MJS's petition, taken as true,
and Scotty's testimony, there was factually sufficient evidence that the value of the services actually
provided by InsureSuite was $0.00, supporting a benefit-of-the-bargain damages award of $30,750,
the entire amount MJS paid to InsureSuite. 

 We affirm the trial court's award of $30,750 in damages to MJS.


Prejudgment interest

 Also within its second issue, InsureSuite argues that there is factually insufficient
evidence to support an award of prejudgment interest. The trial court awarded $470.10 in
prejudgment interest, representing six percent simple interest on the $30,750 damages award,
accruing beginning on the date the petition was filed through the date judgment was signed. This
calculation is consistent with the generally-applicable calculation methods governing equitable or
common-law prejudgment interest awards. See Johnson & Higgins of Tex., Inc. v. Kenneco Energy,
Inc., 962 S.W.2d 507, 531-33 (Tex. 1998) (conforming accrual and compounding methods
governing equitable or common-law prejudgment interest awards to former article 5069-1.05, § 6);
Tex. Fin. Code Ann. §§ 304.003, .103, .104 (West Supp. 2005) (current iterations of article 5069-1.05, § 6; providing that prejudgment interest in wrongful death, personal injury and property
damage cases is at same rate as applicable postjudgment interest rate in cases where rate is not
specified by contract, computed as simple interest, and begins accruing at earlier of 180 days after
notice of claim or date suit is filed). On the date the judgment was signed, the statutory
postjudgment interest rate (and, therefore, the prejudgment interest rate in cases governed by finance
code section 304.104 or Kenneco) was six percent. See Tex. Fin. Code Ann. § 304.003 (West Supp.
2005); www.occc.state.tx.us/pages/int_rates/JudgmentRateSummary.pdf (judgment rate during June
2005 was six percent) (last visited July 5, 2006); see also Tex. Fin. Code Ann. § 304.007 (West
Supp. 2005) (courts shall take judicial notice of published judgment interest rate).

 InsureSuite's sole contention regarding prejudgment interest is that the trial court
could award it only if "an ascertainable sum of money is determined to have been due and payable
at a date certain prior to judgment." Based on that proposition, InsureSuite contends that there is
factually insufficient evidence in the record that an ascertainable sum was due and payable at a date
certain prior to judgment to permit the court to award prejudgment interest. InsureSuite's central
premise is flawed. 

 For the proposition that the trial court could award prejudgment interest only if there
was sufficient evidence of an ascertainable sum due and payable on a date certain prior to judgment,
InsureSuite relies on authorities addressing equitable or common-law interest awards prior to Cavnar
v. Quality Control Parking. Compare Cavnar v. Quality Control Parking, 696 S.W.2d 549, 551-54
(Tex. 1986), with Phillips Petroleum Co. v. Stahl Petroleum Co., 569 S.W.2d 480, 488-89 (Tex.
1978). Cavnar and its progeny abandoned the traditional limitation that equitable or common-law
prejudgment interest could be awarded only when damages were fixed and ascertainable prior to
judgment. Cavnar, 696 S.W.2d at 551-54; see also A Guide to Recent Changes & New Challenges
in Texas Prejudgment Interest Law, 30 Tex. Tech L. Rev. 71, 77-81 (1999). While Kenneco
modified Cavnar's accrual and compounding formulas in a manner serving to reduce most awards,
it did not return to the pre-Cavnar "fixed and ascertainable" limitation. Kenneco, 962 S.W.2d at
531-33. There is thus no support for InsureSuite's premise that MJS was required to prove that its
damages were fixed and ascertainable prior to judgment, at least if prejudgment interest is governed
by Kenneco.

 In effect, under the current legal landscape governing prejudgment interest, the
standards of Kenneco and finance code section 304.003 govern each case unless a different standard
is provided by contract or a specific prejudgment interest statute. See, e.g., ExxonMobil Corp. v.
Valence Operating Co., 174 S.W.3d 303, 319-20 (Tex. App.--Houston [1st Dist.] 2005, pet. denied)
(because no enabling statute applied and contract did not specify interest rate, prejudgment interest
in breach-of-contract action properly awarded pursuant to section 304.003); Perkins v. Group Life
& Health Ins. Co., 49 S.W.3d 503, 506 (Tex. App.--Austin 2001, pet. denied) (denying recovery
for prejudgment interest because Texas Employees Uniform Group Insurance Benefits Act did not
authorize it); AU Pharm., Inc. v. Boston, 986 S.W.2d 331, 334-35 (Tex. App.--Texarkana 1999, no
pet.) (section 302.002 of finance code inapplicable when parties agreed to zero percent interest); see
also Prejudgment Interest, 1 State Bar of Tex. Prof. Dev. Program, Advanced Civil Trial Course,
8, 1 & n.3, 2 (2005). In addition to relying on pre-Cavnar equitable prejudgment interest cases,
InsureSuite also invokes authorities construing former article 5069-1.03 of the revised civil statutes. 
See Republic Nat'l Bank v. Northwest Nat'l Bank, 578 S.W.2d 109, 116-17 (Tex. 1979); see also
Great Am. Ins. Co. v. North Austin Mun. Util. Dist. No. 1, 950 S.W.2d 371, 372-75 (Tex. 1997);
Perry Roofing Co. v. Olcott, 744 S.W.2d 929, 930 (Tex. 1988). Article 5069-1.03 authorized
prejudgment interest at six percent per annum under contracts "ascertaining the sum payable,"
accruing thirty days after the date the sum became due and payable. Act of May 24, 1979, 66th Leg.,
R.S., ch. 707, § 1, 1979 Tex. Gen. Laws 1718, 1718, repealed by Act of June 2, 1997, 75th Leg.,
R.S., ch. 1396, § 48, 1997 Tex. Gen. Laws 5202, 5250 (enacting Texas Credit Title). In a breach of
contract claim, this limitation required that the contract provide the conditions upon which the
liability depends, and that it fix a measure by which the sum payable can be ascertained with
reasonable certainty. North Austin Mun. Util. Dist. No. 1, 950 S.W.2d at 373.

 There is currently considerable doubt whether the current statutory iteration of article
5069-1.03 addresses or regulates prejudgment interest. See Tex. Fin. Code Ann. § 302.002 (West
Supp. 2005); Prejudgment Interest, 1 State Bar of Tex. Prof. Dev. Program, Advanced Civil Trial
Course, at 6-8 (citing authorities). We need not determine if it does, however, because even if MJS's
breach-of-contract claim was governed by that provision, the trial court could have awarded Kenneco
prejudgment interest on MJS's fraud and DTPA claims.

 We overrule InsureSuite's second issue.


DTPA findings

 In its third and final issue, InsureSuite urges that the trial court erred in awarding
damages to MJS because it failed to make findings that MJS met conditions precedent to recovery
under the DTPA. See Tex. Bus. & Com. Code Ann. § 17.505(a) (West 2002) (notice of claim). 
We need not reach this issue because even if meritorious, the trial court could have awarded the
damages under MJS's breach of contract and common-law fraud theories. "When there are multiple
grounds that could support the [trial] court's decision, we will affirm unless all grounds are
disproved." Lopez v. Texas Workers' Comp. Ins. Fund, 11 S.W.3d 490, 493 (Tex. App.--Austin
2000, pet. denied); see also Rogers v. Ricane Enters., Inc., 772 S.W.2d 76, 79 (Tex. 1989). We 
overrule InsureSuite's third issue.


CONCLUSION


 We affirm the trial court's judgment.



 __________________________________________

 Bob Pemberton, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed

Filed: July 28, 2006

1. The petition explains that visitors would be given the option to opt-out of providing their
personal information and e-mail address to MJS by unchecking a box within MJS's content. Only
visitors who left their box checked would have their information and e-mail address forwarded to
MJS. 
2. The petition refers to this Web site as "win.insuresuite.com." MJS's brief and the affidavit
testimony of Michael Scotty, discussed below, term it "www.insuresuite.com," and we will use the
latter designation.