# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00822-CV

**InsureSuite, Inc., Appellant**

**v.**

**MJS Marketing, L.P., Appellee**

### FROM THE COUNTY COURT AT LAW NO. 2 OF TRAVIS COUNTY, NO. 284311, HONORABLE J. DAVID PHILLIPS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is a restricted appeal from a no-answer default judgment awarding appellee MJS Marketing, L.P. $30,750 in damages, plus prejudgment interest and attorney's fees. In three issues, appellant InsureSuite, Inc. challenges the trial court's personal jurisdiction over it; the factual sufficiency of evidence supporting the award of damages, including prejudgment interest; and the absence of findings that MJS satisfied statutory prerequisites for recovery under its Deceptive Trade Practices-Consumer Protection Act ("DTPA") claim. *See* Tex. Bus. & Com. Code Ann. §§ 17.41-.63 (West 2002 & Supp. 2005). We affirm.

## FACTUAL BACKGROUND

The following facts are alleged in MJS's original petition and taken as true in light of InsureSuite's default. *See Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 732 (Tex. 1984).

MJS is a Texas limited partnership in the business of supplying Internet advertising services to its customers. MJS provides such services by purchasing e-mail addresses in bulk from sellers who agree to place MJS's copy on their own Web sites—a process called "co-registration"—and forward to MJS the e-mail addresses of persons who visit the sellers' Web sites and elect to receive communications from MJS. If visitors elect to receive MJS communications,[1] the seller forwards their information to MJS for a price. MJS benefits from this system by obtaining current information and e-mail addresses from persons willing to be contacted, which it can then aggregate into lists through which it can e-mail advertisements and offers. But, MJS further alleged, "it is crucially important to obtain current information and valid e-mail addresses only from persons who are willing to be contacted. Invalid e-mail addresses and addresses for persons who have not chosen to be contacted are of no use to MJS."

InsureSuite is a Delaware corporation whose "home office and principal place of business" is "600 N. Brand Blvd., Glendale, CA 91203-4207." InsureSuite contacted MJS in October 2003, offering to sell the personal information and e-mail addresses of visitors to its Web site, www.insuresuite.com,[2] who agreed to let MJS contact them. MJS "told InsureSuite that it did not want and would not pay for 'bundled' e-mail addresses [those obtained from other sellers or obtained in other ways, such as from bulletin boards or chat rooms]," but wanted only e-mail

---

[1] The petition explains that visitors would be given the option to opt-out of providing their personal information and e-mail address to MJS by unchecking a box within MJS's content. Only visitors who left their box checked would have their information and e-mail address forwarded to MJS.

[2] The petition refers to this Web site as "win.insuresuite.com." MJS's brief and the affidavit testimony of Michael Scotty, discussed below, term it "www.insuresuite.com," and we will use the latter designation.

information from current visitors to www.insuresuite.com who were willing to be contacted by MJS. InsureSuite indicated that it could produce approximately 300,000 valid co-registration e-mail addresses each month. Based on these representations, MJS agreed to pay InsureSuite for each address that InsureSuite provided. MJS's petition states that it "would not have entered into this agreement but for InsureSuite's representations that the e-mail addresses it received from InsureSuite would be only from those current addresses provided by visitors to InsureSuite's [www].insuresuite.com website who were willing to be contacted by MJS."

By the summer of 2004, MJS began noticing that a large number of the e-mail addresses it was receiving from InsureSuite were duplicating addresses MJS already had. Later, MJS discovered that 90 percent of e-mail addresses from InsureSuite duplicated addresses provided by another seller. A subsequent independent audit of the data revealed that many of the e-mail addresses were subscribed from either unrouted or unroutable IP (Internet protocol) spaces. MJS also determined that the traffic at www.insuresuite.com was not sufficient to yield the number of e-mail addresses InsureSuite had been providing. These facts enabled MJS to deduce that InsureSuite had not been providing it genuine e-mail addresses actually obtained through www.insuresuite.com, and had done so "knowingly and fraudulently." MJS "estimates that it has paid InsureSuite over $30,750 for worthless e-mail addresses obtained from sources other than the agreed-upon website."

## PROCEDURAL HISTORY

MJS filed suit against InsureSuite, alleging fraud, breach of contract, and DTPA violations. It alleged under each claim that InsureSuite's conduct caused it "at least $30,750" in actual damages. Because the suit arose out of business conducted in Texas but InsureSuite does not

3

have a place of business in this state and has not designated an agent for service in this state, MJS served InsureSuite by substitute service on the Secretary of State. *See* Tex. Civ. Prac. & Rem. Code Ann. § 17.044 (b) (West 1997). On April 4, 2005, the Secretary of State issued a certificate, filed in the record, stating that (1) the citation and MJS's original petition were received by his office on March 17, 2005; (2) his office forwarded the citation and the petition to InsureSuite on March 22, 2005, by certified mail, return receipt requested to "InsureSuite, Inc., 600 N Brand Blvd, Glendale, CA 91203-4207"; and (3) the Secretary of State received the return receipt, bearing the signature of addressee's (InsureSuite's) agent, on March 28, 2005.

InsureSuite did not file an answer. A damages trial was held on June 15, 2005, at which InsureSuite did not appear. The trial court heard evidence of MJS's damages in the form of an affidavit from Michael Scotty, manager of the general partner of MJS. In addition to echoing the liability allegations in MJS's petition, Scotty's affidavit states that "MJS paid $30,750 for these e-mail addresses" and that

> when InsureSuite failed to live up to its agreement by providing fraudulent e-mail addresses and addresses that were not obtained from current visitors to the www.insuresuite.com website, and when InsureSuite intentionally and knowingly misrepresented the amount, source, validity, and authenticity of the e-mail addresses that it promised to provide, MJS was damaged in the amount of $30,750.00.

The trial court rendered judgment awarding MJS $30,750.00, plus $470.10 in prejudgment interest, "calculated at the rate of 6 percent per annum, uncompounded, from March 14, 2005," the date suit was filed, "until the date judgment is signed." The court also awarded attorney's fees.

4

## DISCUSSION

InsureSuite brings three issues on appeal. In its first issue, InsureSuite contends that citation and service were defective, preventing the trial court from acquiring personal jurisdiction over it. Alternatively, InsureSuite contends that, if the trial court did have personal jurisdiction, the evidence was factually insufficient to support the damages award. In its third issue, InsureSuite argues that the trial court erred in awarding damages because it failed to make findings that all conditions precedent under the DTPA were satisfied.

### Standard and scope of review

A restricted appeal is available only if:

1. The appeal is brought within 6 months of the date of judgment

2. by a party to the suit

3. who did not participate at trial; and

4. error must be apparent from the face of the record.

Tex. R. App. P. 26.1(c) (West 2003); *Quaestor Invs., Inc. v. State of Chiapas*, 997 S.W.2d 226, 227 (Tex. 1999). MJS agrees that InsureSuite has satisfied the first three requirements, so we need only address whether error is apparent on the face of the record. The "face of the record" consists of all papers on file in the appeal, including the reporter's record. *Norman Communications v. Texas Eastman, Co.*, 955 S.W.2d 269, 270 (Tex. 1997).

The scope of our review is the same as in ordinary appeals; that is, we review the entire case. *Id.* This includes evidentiary sufficiency claims. *Id.*

5

**Personal jurisdiction**

A trial court can render a default judgment only if it has personal jurisdiction over the defendant and the case is ripe for judgment. *Finlay v. Jones*, 435 S.W.2d 136, 138 (Tex. 1968). This requires the trial court to determine that the defendant was properly served with citation and that there is no answer on file. *Id.* at 139. A default judgment cannot withstand direct attack by a defendant who demonstrates that he was not served in strict compliance with applicable requirements. *Wilson v. Dunn*, 800 S.W.2d 833, 836 (Tex. 1990). Presumptions of valid issuance, service, and return of citation do not apply in a default judgment. *Primate Constr., Inc. v. Silver*, 884 S.W.2d 151, 152 (Tex. 1994).

To sustain a judgment against an out-of-state defendant served by substituted service through the Secretary of State, the record must show that the Secretary of State complied with the requirements of the long-arm statute. *GMR Gymnastics Sales, Inc. v. Walz*, 117 S.W.3d 57, 59 n. 1 (Tex. App.—Fort Worth 2003, pet. denied). The long-arm statute provides, in relevant part, that if the Secretary of State is served with process for a non-resident, the documents "shall contain a statement of the name and address of the nonresident's home or home office and the secretary of state shall immediately mail a copy of the process to the nonresident at the address provided." Tex. Civ. Prac. & Rem. Code Ann. § 17.045(a) (West Supp. 2005).

Proof of proper service under the long-arm statute can be satisfied by a certificate from the Secretary of State. *Campus Invs., Inc. v. Cullever*, 144 S.W.3d 464, 466 (Tex. 2004); *Capitol Brick, Inc. v. Fleming Mfg. Co.*, 722 S.W.2d 399, 401 (Tex. 1986); *Whitney v. L & L Realty Corp.*, 500 S.W.2d 94, 96 (Tex. 1973). In fact, "[a]bsent fraud or mistake, the Secretary of State's

6

certificate is conclusive evidence that the Secretary of State, as agent of [the defendant], received service of process for [the defendant] and forwarded the service as required by the statute." *Capitol Brick*, 722 S.W.2d at 401.

Here, the Secretary of State issued a certificate dated April 4, 2005, stating that his office received "a copy of the Citation and [MJS's] Original Petition. . . ." The certificate also states that a copy was forwarded to InsureSuite, by certified mail, return receipt requested, and that his office received the return receipt, signed by InsureSuite's agent, on March 28, 2005. This certificate conclusively establishes that the Secretary of State received service of process for InsureSuite and forwarded it to InsureSuite as required by the long-arm statute. *Capitol Brick*, 722 S.W.2d at 401.

However, facts showing defective citation through substituted service may be brought in a restricted appeal. *See Wright Bros. Energy, Inc. v. Krough*, 67 S.W.3d 271, 272-73 (Tex. App.—Houston [1st Dist.] 2001, no pet.). InsureSuite contends that service was defective here because the address on the Secretary of State's certificate omits the floor number on which its office is located and thereby incorrectly states its business address. But there is nothing *on the face of the record* that shows that the address on the Secretary of State's certificate is incorrect. *Wolfe v. Grant Prideco, Inc.*, 53 S.W.3d 771, 774 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (holding that, although court clerk sent notice to address in central register instead of address on pleadings, nothing in record showed address was incorrect on date notice was sent); *Robert S. Wilson Invs. No. 16, Ltd. v. Blumer*, 837 S.W.2d 860, 862 (Tex. App.—Houston [1st Dist.] 1992, no writ) (holding no error on face of record because nothing in record established post office box address was not correct mailing address).

7

InsureSuite also contends that service is defective because the Secretary of State's certificate fails to state that the address to which service was sent is the home or home office of InsureSuite. We disagree. The long arm statute requires:

> If the secretary of state is served with duplicate copies of process for a nonresident, the documents shall contain a statement of the name and address of the nonresident's home or home office and the secretary of state shall immediately mail a copy of the process to the nonresident at the address provided.

Tex. Civ. Prac. & Rem. Code Ann. § 17.045(a) (West Supp. 2005). Here, MJS provided a copy of the original petition to the Secretary of State. The petition states that service of process should be forwarded to InsureSuite "at InsureSuite's home office and principal place of business, 600 N Brand Blvd, Glendale, CA 91203-4207." The Secretary of State's certificate states that it received a copy of the citation and original petition, that a copy was forwarded to InsureSuite at 600 N Brand Blvd, Glendale, CA 91203-4207, and that it received the return receipt bearing the signature of addressee's agent. This is evidence that the documents containing a statement of the home office address were received in compliance with the long-arm statute. *Cf. World Distribs., Inc. v. Knox*, 968 S.W.2d 474, 477-78 (Tex. App.—El Paso 1998, no pet.) (holding service was defective because petition did not allege and nothing in record established that address provided was home address); *Whiskeman v. Lama*, 847 S.W.2d 327, 330 (Tex. App.—El Paso 1993, no writ) (holding citation defective because petition did not allege address provided was home or home office address and nothing in record showed it was home address); *Verges v. Lomas & Nettleton Fin. Corp.*, 642 S.W.2d 820, 823 (Tex. App.—Dallas 1982, no writ) (holding citation defective because petition provided "last known address" which is not equivalent to "home address").

8

Concluding that there is nothing on the face of the record that demonstrates defective service, we overrule InsureSuite's first issue.

**Damages**

In its second issue, InsureSuite claims that the evidence was factually insufficient to support the trial court's judgment for unliquidated damages. It does not dispute legal sufficiency. In a factual sufficiency review, an appellate court must consider and weigh all the evidence, and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Once a default judgment is taken, all allegations set forth in the petition are deemed admitted, except the amount of unliquidated damages. *Texas Commerce Bank, N.A. v. New*, 3 S.W.3d 515, 516 (Tex. 1999). The trial court must hear evidence regarding unliquidated damages. Tex. R. Civ. P. 243; *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 (Tex. 1992). Damages can be established through affidavit testimony. *New*, 3 S.W.3d at 516. Although affidavits are hearsay, unobjected-to hearsay constitutes probative evidence and satisfies the requirement for evidence of unliquidated damages. *Id.* at 517. The amount due under a written instrument can be proven by testimony. *Id.* Additionally, a plaintiff in a default judgment must present evidence of a "causal nexus" between the basis of the suit and the alleged injuries. *Morgan*, 675 S.W.2d at 732.

The only evidence of damages is the affidavit of Michael Scotty. Scotty testified that MJS paid $30,750.00 to InsureSuite and was damaged in this amount by InsureSuite's actions. He also supplied a causal nexus between MJS's claims and its injuries, stating that MJS's damages were

9

caused by InsureSuite "intentionally and knowingly misrepresent[ing] the amount, source, validity, and authenticity of the e-mail addresses that it promised to provide . . . ."

InsureSuite insists that this testimony is factually insufficient proof of damages because it does not supply a basis for awarding benefit-of-the-bargain damages to MJS; specifically, the value actually received by MJS. From the factual allegations in MJS's petition, taken as true, and Scotty's testimony, there was factually sufficient evidence that the value of the services actually provided by InsureSuite was $0.00, supporting a benefit-of-the-bargain damages award of $30,750, the entire amount MJS paid to InsureSuite.

We affirm the trial court's award of $30,750 in damages to MJS.

**Prejudgment interest**

Also within its second issue, InsureSuite argues that there is factually insufficient evidence to support an award of prejudgment interest. The trial court awarded $470.10 in prejudgment interest, representing six percent simple interest on the $30,750 damages award, accruing beginning on the date the petition was filed through the date judgment was signed. This calculation is consistent with the generally-applicable calculation methods governing equitable or common-law prejudgment interest awards. *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 531-33 (Tex. 1998) (conforming accrual and compounding methods governing equitable or common-law prejudgment interest awards to former article 5069-1.05, § 6); Tex. Fin. Code Ann. §§ 304.003, .103, .104 (West Supp. 2005) (current iterations of article 5069-1.05, § 6; providing that prejudgment interest in wrongful death, personal injury and property damage cases is at same rate as applicable postjudgment interest rate in cases where rate is not

specified by contract, computed as simple interest, and begins accruing at earlier of 180 days after notice of claim or date suit is filed). On the date the judgment was signed, the statutory postjudgment interest rate (and, therefore, the prejudgment interest rate in cases governed by finance code section 304.104 or *Kenneco*) was six percent. *See* Tex. Fin. Code Ann. § 304.003 (West Supp. 2005); www.occc.state.tx.us/pages/int_rates/JudgmentRateSummary.pdf (judgment rate during June 2005 was six percent) (last visited July 5, 2006); *see also* Tex. Fin. Code Ann. § 304.007 (West Supp. 2005) (courts shall take judicial notice of published judgment interest rate).

InsureSuite's sole contention regarding prejudgment interest is that the trial court could award it only if "an ascertainable sum of money is determined to have been due and payable at a date certain prior to judgment." Based on that proposition, InsureSuite contends that there is factually insufficient evidence in the record that an ascertainable sum was due and payable at a date certain prior to judgment to permit the court to award prejudgment interest. InsureSuite's central premise is flawed.

For the proposition that the trial court could award prejudgment interest only if there was sufficient evidence of an ascertainable sum due and payable on a date certain prior to judgment, InsureSuite relies on authorities addressing equitable or common-law interest awards prior to *Cavnar v. Quality Control Parking*. *Compare Cavnar v. Quality Control Parking*, 696 S.W.2d 549, 551-54 (Tex. 1986), *with Phillips Petroleum Co. v. Stahl Petroleum Co.*, 569 S.W.2d 480, 488-89 (Tex. 1978). *Cavnar* and its progeny abandoned the traditional limitation that equitable or common-law prejudgment interest could be awarded only when damages were fixed and ascertainable prior to judgment. *Cavnar*, 696 S.W.2d at 551-54; *see also A Guide to Recent Changes & New Challenges*

11

*in Texas Prejudgment Interest Law*, 30 Tex. Tech L. Rev. 71, 77-81 (1999). While *Kenneco* modified *Cavnar*'s accrual and compounding formulas in a manner serving to reduce most awards, it did not return to the pre-*Cavnar* "fixed and ascertainable" limitation. *Kenneco*, 962 S.W.2d at 531-33. There is thus no support for InsureSuite's premise that MJS was required to prove that its damages were fixed and ascertainable prior to judgment, at least if prejudgment interest is governed by *Kenneco*.

In effect, under the current legal landscape governing prejudgment interest, the standards of *Kenneco* and finance code section 304.003 govern each case unless a different standard is provided by contract or a specific prejudgment interest statute. *See*, *e.g.*, *ExxonMobil Corp. v. Valence Operating Co.*, 174 S.W.3d 303, 319-20 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (because no enabling statute applied and contract did not specify interest rate, prejudgment interest in breach-of-contract action properly awarded pursuant to section 304.003); *Perkins v. Group Life & Health Ins. Co.*, 49 S.W.3d 503, 506 (Tex. App.—Austin 2001, pet. denied) (denying recovery for prejudgment interest because Texas Employees Uniform Group Insurance Benefits Act did not authorize it); *AU Pharm., Inc. v. Boston*, 986 S.W.2d 331, 334-35 (Tex. App.—Texarkana 1999, no pet.) (section 302.002 of finance code inapplicable when parties agreed to zero percent interest); *see also Prejudgment Interest*, 1 State Bar of Tex. Prof. Dev. Program, Advanced Civil Trial Course, 8, 1 & n.3, 2 (2005). In addition to relying on pre-*Cavnar* equitable prejudgment interest cases, InsureSuite also invokes authorities construing former article 5069-1.03 of the revised civil statutes. *See Republic Nat'l Bank v. Northwest Nat'l Bank*, 578 S.W.2d 109, 116-17 (Tex. 1979); *see also Great Am. Ins. Co. v. North Austin Mun. Util. Dist. No. 1*, 950 S.W.2d 371, 372-75 (Tex. 1997);

12

*Perry Roofing Co. v. Olcott*, 744 S.W.2d 929, 930 (Tex. 1988). Article 5069-1.03 authorized prejudgment interest at six percent per annum under contracts "ascertaining the sum payable," accruing thirty days after the date the sum became due and payable. Act of May 24, 1979, 66th Leg., R.S., ch. 707, § 1, 1979 Tex. Gen. Laws 1718, 1718, *repealed by* Act of June 2, 1997, 75th Leg., R.S., ch. 1396, § 48, 1997 Tex. Gen. Laws 5202, 5250 (enacting Texas Credit Title). In a breach of contract claim, this limitation required that the contract provide the conditions upon which the liability depends, and that it fix a measure by which the sum payable can be ascertained with reasonable certainty. *North Austin Mun. Util. Dist. No. 1*, 950 S.W.2d at 373.

There is currently considerable doubt whether the current statutory iteration of article 5069-1.03 addresses or regulates prejudgment interest. *See* Tex. Fin. Code Ann. § 302.002 (West Supp. 2005); *Prejudgment Interest*, 1 State Bar of Tex. Prof. Dev. Program, Advanced Civil Trial Course, at 6-8 (citing authorities). We need not determine if it does, however, because even if MJS's breach-of-contract claim was governed by that provision, the trial court could have awarded *Kenneco* prejudgment interest on MJS's fraud and DTPA claims.

We overrule InsureSuite's second issue.

**DTPA findings**

In its third and final issue, InsureSuite urges that the trial court erred in awarding damages to MJS because it failed to make findings that MJS met conditions precedent to recovery under the DTPA. *See* Tex. Bus. & Com. Code Ann. § 17.505(a) (West 2002) (notice of claim). We need not reach this issue because even if meritorious, the trial court could have awarded the damages under MJS's breach of contract and common-law fraud theories. "When there are multiple

13

grounds that could support the [trial] court's decision, we will affirm unless all grounds are disproved." *Lopez v. Texas Workers' Comp. Ins. Fund*, 11 S.W.3d 490, 493 (Tex. App.—Austin 2000, pet. denied); *see also Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 79 (Tex. 1989). We overrule InsureSuite's third issue.

## CONCLUSION

We affirm the trial court's judgment.

 

 

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed

Filed:   July 28, 2006

14